470 F.Supp.2d 1118 (2006)
SOUTHWEST CENTER FOR BIOLOICAL DIVERSITY, California Native Plant Society, Wetlands Action Network, Save Our Forests and Ranchlands, Carmel Mountain Conservancy, Preserve Wild Santee, Iron Mountain *1119 Conservancy, Ramonans for Sensible Growth, San .Diego Audubon Society, Sierra Club, Horned Lizard Conservation Society, San Diego Herpetological Society, Earth Media, Inc., and Preserve South Bay, Plaintiffs,
v.
Jim BARTEL, Anne Badgley, and Gale Norton, Defendants, and
Building Industry Legal Defense Foundation, National Association of Home Builders, California Building Industry Association, Building Industry Association of San Diego, and Pardee Construction Company, Intervening Defendants.
Building Industry Legal Defense Foundation, National Association of Home Builders, California Building Industry Association, and Building Industry Association of San Diego, Cross-Complainants,
v.
United States Fish and Wildlife Service, Gale Norton, City of San Diego, and Anne Badgley, Cross-Defendants, and
Southwest Center for Biological Diversity, Sierra Club, California Native Plant Society, San Diego Audubon Society, and Preserve The South Bay, Intervening Defendants.
No. 98-CV-2234-B(JMA).
United States District Court, S.D. California.
December 15, 2006.
*1120 *1121 *1122 Daniel J. Rohlf, Portland, OR, for Plaintiffs.
Marco Antonio Gonzalez, Coast Law Group, Encinitas, CA, Neil Levine, Earthjustice, Washington, DC, for Plaintiffs/Intervenor Defendants.
U S Attorney CV, Thomas C. Stahl, U S Attorneys Office Southern District Of California Civil Division, San Diego, CA, Jane P. Davenport, Keith W. Rizzardi, Wildlife and Marine Resources Section, Environment and National Resources Divis U S Department of Justice, Martin McDermott, US Department of Justice, Environmental Defense Section, Washington, DC, Stephen M. Macfarlane, United States Department of Justice, Environmental Natural Resource Divison, Sacremento, CA, for Defendants/Cross Defendants.
Stephen J. Odell, Law Offices of Stephen J. Odell, Portland, OR, William E. Halle, Hewitt and O'Neil Llp, Irvine, CA, for Intervenor Defendant.
John Peter Mullen, Richard A. Duvernay, Office of the City Attorney Civil Division, San Diego, CA, for Cross Defendant.

AMENDED DECISION AND INJUNCTION
BREWSTER, Senior District Judge.
In this Endangered Species Act ("ESA," 16 U.S.C. งง 1531-1544) case, fourteen national, state, and local conservation and environmental groups[1] (hereinafter "Plaintiffs") challenge the decision of the United States Fish and Wildlife Service[2] (hereinafter "FWS" or "Federal Defendants") to issue an incidental take permit ("ITP") under ง 10 of the ESA to the City of San Diego[3] based upon its conservation plan. *1123 This Court has jurisdiction under the citizen suit provision of the ESA. ง 1540(g). Though the City's ITP governs 85 species, Plaintiffs' lawsuit is limited to seven vernal Pool speciesโtwo small aquatic crustacean species (San Diego fairy shrimp and Riverside fairy shrimp) and five plant species (Otay mesa mint, California Orcutt grass, San Diego button celery, San Diego mesa mint, and spreading navarretia (also known as prostrate navarretia) โ which are listed as "endangered" or "threatened.") Third Amended Complaint ถ 41-42 ("TAC").
A construction company and four building associations intervened (hereinafter "Builder Intervenors")[4] and filed a crosscomplaint against the Federal Defendants and the City of San Diego to challenge the scope of the .ITP provisions on those same seven vernal pool species. Southwest Ctr. for Biological Diversity v. Berg, 268 F.3d 810, 820-22 (9th Cir.2001); Cross Compl. ถ 9-12; see Order Resolving Subject Matter Jurisdiction at 4-5 (filed Sept. 8, 2004).
Having considered the administrative record, the legal briefs, and the relevant case law, it appears to this Court that the ITP would permit monumental destruction of the vernal pool species, which are extremely sensitive to their environment and were virtually extinct in 1995. The Court finds that FWS overlooked an important aspect of the operation of the Assurances because the malleable standard โ to avoid the pools when "practicable" โ virtually guarantees development and the ersatz mitigation measures run counter to the realistic needs of these dwindling vernal pool species and may hasten their extinction. It is undisputed that the fairy shrimp cannot be transferred by human transplant from one area to another with any measure of reliability or survivability. Yet, a close examination of the record reveals that FWS has authorized extensive development of lands containing vernal pools that would destroy essential habitat for these rare species under the guise of obtaining promises for "mitigation" in other areas. The ostensible "mitigation" is inadequate to ensure that the fairy shrimp will survive and recover to the point where they need not be listed for protection of the ESA. In short, while vigorous development is certain, the purported mitigation is unlikely to conserve the listed species. Moreover, the record does not support FWS's finding that the City of San Diego would fund its share of the conservation plan. The Court finds that this plan violates both the spirit and letter of the ESA.
More specifically, the Court finds that FWS must re-initiate consultation proceedings on the City's ITP because the avenue of seeking permits from the United States Army Corps of Engineers ("ACOE") is no longer available for vernal pools,, and the remaining conservation measures are inadequate to protect these fragile species. FWS concedes that it did not examine the impact of the City's plan on the vernal pool species because FWS did not anticipate any impact on those species; instead, FWS expected to evaluate any impact on particular sites in future permit procedures. That structure violates the ESA as to the vernal pool species in this case because *1124 FWS has locked in any mitigation, that could be recommended or would be required to the measures delineated in the City's conservation plan โ the very plan that FWS did not assess for adequate protection of the vernal pool species because it deferred that evaluation to future proceedings and that uses mitigation measures that FWS had previously concluded are ineffective, experimental, and inadequate given the strict needs of the imperiled vernal pool species. The position of FWS thus circles back onto itself, and the species are left in a "heads I lose, tails you win" position that substitutes inadequate conservation measures in the place of the strict conservation and recovery standards of the ESA. Consequently, the Court finds that the Assurances in the Implementing Agreement ("IA"), as applied to the vernal pool species, violate the ESA because they are inconsistent with the governing statutory command to conserve the vernal pool species to bring them to the point at which protection by the ESA is no longer necessary. ง 1523(3).
One might ask, when all is said and done, "who cares about the fairy shrimp and the other vernal pool species?" Fairy shrimp, when they manage to survive to adulthood, are one-quarter inch fully grown. For the most part, they are hard to see by the naked eye. There are not many left, and if gone, who would miss there Surely, the casual observer passing through the Southern California landscape would not notice one way or the other. The biologists tell us that every species has an essential and unique roll to play in the food chain that supports us all. If the fairy shrimp ultimately become extinct in the San Diego region, they will cease to be a devourer of lower forms of life in the food chain, such as bacteria and micro algae on clay particles, which could impact control on the species below. Similarly, the fairy shrimp would not be available food for creatures above in the chain, such as waterfowl and toads, who look to them for their diet. In the microscopic view, the fairy shrimp may make little, identifiable difference. But if this type of destruction is treated on a case-by-case basis as an unimportant loss, it does not take long before life on this planet is in jeopardy. Congress saw that threat when it enacted the ESA. ง 1531(b). Congress demonstrated foresight by realizing that the country's present understanding of the value of a myriad of life forms was not yet known, and that extinction should be prevented by protecting both the individual species and the ecosystems upon which those species depended for survival. Id.
It is not for this Court to be sympathetic or unsympathetic to the vernal pool species, but it is the Court's obligation to interpret and follow the law as written. This permit, with its massive development of vernal pool habitat and highly questionable mitigation techniques for a species that cannot be simply gathered and moved to another location, violates the fundamental objective of the ESA to conserve listed species to bring them to the point at which statutory protection is no longer necessary. The Court declines to approve it.
I. Endangered Species Act
The ESA, enacted by Congress and signed by the President, reflects a national concern for the preservation and replenishment of a rapidly growing list of species who are threatened or endangered with extinction. "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." Tennessee Valley Authority v. Hill, 437 U.S. 153, 175, 184 & n. 29, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest *1125 of priorities, thereby adopting a policy which it described as 'institutionalized caution.'" Id. at 194, 98 S.Ct. 2279. "Congress was concerned about the unknown uses that endangered species might have and about the unforeseeable place such creatures may have in the chain of life on this planet." Id. at 178-79, 98 S.Ct. 2279.
The statute clearly states that the purpose is to protect and preserve endangered species. The stated purposes of the ESA "are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species," and to comply with international treaties to protect wildlife, birds, fish, and plants. ง 1531(b); ง 1531(c)(1); ง 1536(a)(1); ง 1537; ง 1539(a)(2)(A). Congress broadly defined "conserve" as "the use of all methods and procedures which are necessary to bring any endangered species and threatened species to the point at which the measures provided [by the ESA] are no longer necessary." ง 1532(3). [T]he ESA was en acted not merely to forestall the extinction of species (i.e., promote a species survival), but to allow a species to recover to the point where it may be delisted. . . . [I]t is clear that Congress intended that conservation and survival be two different (though complementary) goals of the ESA." Gifford Pinchot Task Force v. United States FWS, 378 F.3d 1059, 1070 (9th Cir.2004) (invalidating FWS's interpretation of a regulation that narrowed scope of protection commanded by clear language in ESA).[5] As aptly stated by one district court, "[t]he whole purpose of listing species as `threatened' or `endangered' is not simply to memorialize species that are on the path to extinction, but also to compel those changes needed to save the species from extinction." Oregon Natural Resources Council v. Daley, 6 F.Supp.2d 1139, 1152 (D.Or.1998). Congress imposed this mandatory duty to conserve endangered species on all federal agencies. Tennessee Valley, 437 U.S. at 180, 98 S.Ct. 2279 (citing ง 1531(c)(1)); see also Defenders of Wildlife v. United States EPA, 420 F.3d 946, 965 (9th Cir.2005) (concluding that sections 7(a)(1) and 7(a)(2) imposed separate and distinct requirements to mandate and authorize all federal agencies to conserve endangered species and their ecosystems).
II. Standard of Review
"Because ESA contains no internal standard of review, section 706 of the Administrative Procedure Act, 5 U.S.C. ง 706, governs review of the Secretary's actions." Village. of False Pass v. Clark, 733 F.2d 605, 609 (9th Cir.1984); Friends of Endangered Species v. Jantzen, 589 F.Supp. 113, 118 (N.D.Cal.1984) (summary judgment is appropriate vehicle to review administrative action), aff'd, 760 F.2d 976 (9th Cir.1985). Agency decisions cannot be inconsistent with the governing statute. Defenders of Wildlife, 420 F.3d at 959; 5 *1126 U.S.C. ง 706(2)(A) ("arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The Court must determine whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). In other words, whether the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).
The Court has conducted a "thorough, probing, in-depth review." Citizens to Preserve, 401 U.S. at 415, 91 S.Ct. 814. The Court has carefully read and laboriously studied the AR submitted by the parties,[6] and will not repeat that extensive factual background. Instead, the Court has cited the sections of the Record that informed the Court's decision and incorporates by reference those passages into this Order.
III. The Vernal. Pool Species are on the Brink of Extinction
The Riverside fairy shrimp, San Diego fairy shrimp, California Orcutt grass, Otay Mesa mint, San Diego button celery, San Diego mesa mint, and spreading navarretia are listed as "endangered" or "threatened" species. 63 Fed.Reg. 54975-93 (1998); 62 Fed.Reg. 4925-38 (1997); 58 Fed.Reg. 41384-91 (1993); 43 Fed.Reg. 44812 (1978). The Court incorporates by reference the entirety of those detailed descriptions of their particular vulnerabilities and precise needs. E.g., AR 26257, 28862-64, 31491, 31506, 32463-81, 82472, 32880-94. Here, the Court briefly highlights the critical attributes of the two fairy shrimp. The San Diego fairy shrimp and Riverside fairy shrimp inhabit vernal pools โ a fragile, strict, narrow, and' unique habitat โ that form in shallow depressions on hard-clay mesas. Vernal pools are seasonal โ the pools contain water in the short winter months but can be difficult to discern in the landscape during the long dry months. The fairy shrimp hatch, mature, reproduce, *1127 and inhabit the pools during their short life cycle. Fairy shrimp eggs lie dormant during the dry season, and may hatch in the next wet season. These fragile species are extremely sensitive to their environment (including a specific amount of water; a narrow range of water temperature; the water quality, chemistry, and salinity; the length of time the pool holds water before it percolates into the clay soil).
Only Southern California's Mediterranean climate supports this specific habitat, and 97% of the habitat has been irrevocably destroyed.[7] The fairy shrimp are extinct in Los Angeles and Orange counties, and close to extinction in nearby Riverside and Ventura counties. Of the remaining acres, the Record rarely indicates whether and how many fairy shrimp actually inhabit the pools, or assesses the quality in the vernal pool complexes. E.g., AR 30094-95, 31905-06, 32478; 58 Fed.Reg. at 41385.
Vernal pools cannot be "created" and there is no known method to replace destroyed pools. E.g., 62 Fed.Reg. at 4931; AR 32472; Fed. Defs.' Answer to TAC ถ 44. As applied to the vernal pool species, the "creation" of off-site vernal pools is ineffective and unacceptable mitigation. 62 Fed.Reg. at 4931 (attempts to collect and move vernal pool species failed; and re-introducing species into other pools risks hybridization); AR 23724, 24435 (because creation of vernal pool habitat is not successful, "the wildlife agencies do not accept creation as mitigation for vernal pool impacts"); AR 32472 (FWS concludes that efforts to "create" vernal pools by transporting the soil are unsuccessful, unscientific, and unmonitored; and transplanting species had not been tested or proven successful).
IV. The City's Application for a Regional ง 10 Incidental Take Permit and FWS Findings
The ESA makes it unlawful to "take" or harm a listed species. ง 1532(19); Forest Conservation Council v. Rosboro Lumber Co., 50 F.3d 781, 784 (9th Cir.1995) (harm is "defined in the broadest possible manner to include every conceivable way in which a person can `take' or attempt to `take' any fish or wildlife."); National Wildlife Fed'n v. Burlington N.R.R., Inc., 23 F.3d 1508, 1513 (9th Cir.1994) (includes habitat degradation that prevents or possibly retards recovery of species); see also ง 1538(a)(1) (endangered species); 50 C.F.R. ง 17.31 (extending take prohibition to threatened species); Babbitt v. Sweet Home Ch. of Communities, 515 U.S. 687, 696-701, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995).
Section 10 of the E SA provides a narrow exception of a "regulated kill." ง 1539(a)(1)(B); National Wildlife Fed'n v. Norton, 306 F.Supp.2d 920, 926 (E.D.Ca1.2004). In specially-controlled situations, Congress allows the sacrifice of a certain number of creatures provided that *1128 adequate steps are taken to minimize the detriment in a manner that ensures the continued vitality of the species involved overall. Sierra Club v. Babbitt, 15 F.Supp.2d 1274, 1278 n. 3 (S.D.Ala.1998) (an applicant for an ITP must submit an HCP "that will โ as the name plainly connotes โ help 'conserve' the entire species by facilitating its survival and recovery.").
To apply for a ง 10 permit, the property owner or developer must prepare a detailed application. Known as a Habitat Conservation Plan ("HCP"), it must contain specific information, analysis, and plans (including financial support) that specify how the applicant will "minimize and mitigate" the adverse impact on the protected species. ง 1539(a)(2)(A).
This litigation concerns the issuance of an ITP on a regional scale. 60 Fed.Reg. 12246, 12247 (March 6, 1995); e.g., AR 40-48, 5523, 15079-80, XXXXX-XXX, AR 39464, 39477, 39614-16, 39498, 39683-88. An important purpose of this regional approach was to streamline the permit process so that the City would issue ESA take permits directly to developers (known as "Third Party Beneficiaries"). AR 6300, 13624, 19308, 23210, 24679, 39477. The City obtained an "umbrella" permit from the FWS to kill species with mitigation, and developers seeking approval of specific projects obtain authorization from the City rather than going through their own cumbersome application and review process with the FWS. AR 23210; AR 15080; AR 25639; AR 26583-85 (IA ง 17.0).
The ITP covers 543,243 acres within San Diego county. AR 39482; see generally AR 6780-82; AR 23189-90. The City of San Diego's HCP consisted of two documents.[8] The MSCP provided general, regional framework plan. The Subarea Plans contained specific components of each jurisdictions' portion of the entire MSCP area, and the City of San Diego prepared its local Subarea Plan.[9] AR 19617; see AR 26548 (IA ง 2.12). The Court will not repeat the factual background of the regional and local conservation plans, but incorporates the substance of those provisions into this Order. FWS must scrutinize the proposed HCP and determine if it satisfies the specific legal and biological requirements of the ESA. ง 1539(2)(B).
In addition to the specific standards in ง 10, FWS has an overarching duty to conserve listed species by maintaining a viable population. งง 1532(3), 1536(a)(1), (a)(2). FWS is obligated to use its authority to further the purpose of the ESA to *1129 conserve listed species to the point that the substantive and procedural protections of the ESA are no longer required. ง 1536(a)(1); see งง 1532(6), (20) (defining threatened and endangered listings); Gifford, 378 F.3d at 1070. FWS must ensure that its issuance of an ITP "is not like to jeopardize the continued existence of any endangered species." ง 1536(a)(2); Turtle Island Restoration Network v. National Marine Fisheries Sera, 340 F.3d 969, 974 & n. 9 (9th Cir.2003); see generally Defenders of Wildlife, 420 F.3d at 963-67 (describing mandatory duty to guarantee "an additional, do-no-harm obligation"); National Wildlife Fed'n v. Babbitt, 128 F.Supp.2d 1274, 1286 (E.D.Cal.2000). Thus, the City's permit application must satisfy the ESA goal of conservation, which will allow the species to recover in order to "reverse the trend to extinction." Tennessee Valley, 437 U.S. at 153, 98 S.Ct. 2279; Sierra Club v. Babbitt, 15 F.Supp.2d at 1278 n. 3 ("Pursuant to section 10, the FWS may issue a permit for the `incidental take' of some members of the species, if the applicant for the permit submits a `conservation plan' that will โ as its name plainly connotes โ help `conserve' the entire species by facilitating its survival and recovery."). "The overall effect of a project can be beneficial to a, species even though some incidental taking may occur." Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 982 (9th Cir.1985).
The opportunity for further review by the ACOE, with consultation with the FWS, for the issuance of a CWA ง 404 permit was a central component of the planned protection for the vernal pools: The City's HCP set forth other protections, and these protections are set forth in detail in the AR, including "avoidance, minimization, and mitigation measures," AR 22446; incorporating the "no net loss" policy from the federal CWA standard, AR.19348, 19627, 22446, 39517-18, 39524-25, 39527; and enacting the Environmentally Sensitive Lands Ordinance ("ESLO") to avoid impacts, to minimize unavoidable impacts, and to mitigate unavoidable impacts to vernal pools. AR 19671, 25727-32, 25735, 25738-39 & Table 1; see AR 13622, 25735,
The centerpiece of the City's proposed mitigation for the destruction of sensitive species, and a critical component of the regional conservation plan, was to create a permanent natural preserve.[10] AR 39498 (MSCP ง 3.1), 39592-95 (MSCP ง 4.0), 39598, 39611; see AR 3219-23, 5523-24. The "Multi-Habitat Planning Area" will eventually be a 171,917 acre Preserve ("MHPA" or "Preserve"). Eventually, the Preserve will accumulate a contiguous area of vacant land with rich biological diversity that will maximize the protection of the native wildlife and plant species, and possibly, prevent further listings of endangered species. E.g., AR 39483; AR 39525 (MSCP ง 3.5, ถ 4(b)); AR 18654 (if City declined to adopt MSCP and instead let each development project apply for its own ITP, the Preserve would be the same size, but would be less effective because of fragmentation, poor design, and absence of linkages "resulting in increasing risk of species decline and endangerment"); 60 Fed.Reg. 12246, 12247 (describing goals and comparing the "no action" alternative); 61 Fed.Reg. 45983, 45984. The MSCP does not establish the Preserve; rather, it roughly delineates target boundaries. The actual acreage will be dedicated over the next fifty years. 62 Fed.Reg. 14938, 14939. Certain activities would be permitted within the Preserve, including passive recreation such as birdwatching, hiking, and horseback riding; utility lines including repair; low density residential uses; *1130 brush management; and limited agriculture. E.g., AR 19421, 19702-03, 24894. Other activities, while not endorsed, would inevitably occur, such as vehicle and foot traffic by, the United States Border Patrol, illegal immigrants, and itinerant populations. E.g., AR 19677, 39644.
When issuing a ง 10 ITP, the FWS makes its required findings in a Biological Opinion ("BiOp"). Here, FWS issued its BiOp, made its Findings, issued a Record of Decision, entered into a contract (the IA) with the City to complete the project and offered "No Surprises" Assurances, and issued the ITP with Condition I. AR XXXXX-XXX (June 6, 1997 BiOp) (Pls.' Ex. 11 & Fed. Defs.' Ek. B); AR XXXXX-XXX (July 18, 1997 Findings) (Pls.' Ex. 9 & Fed. Defs.' Ex. F); AR 26937-43(ROD) (Pls.' Ex. 10); AR XXXXX-XXX (IA July 16, 1997); 61 Fed.Reg. 45983, 45984; AR 26960-69 (ITP July 18, 1997). The Court has thoroughly read these documents and does not repeat their content in this Order.
V. Analysis and Decision
A. FWS Must Re-Initiate Consultation on the Vernal Pool Species
1. The Supreme Court's Decision Eliminates ACOE Jurisdiction
The Court agrees with Plaintiffs that FWS must reinitiate review of the City's IT? for the vernal pool species in the aftermath of the Supreme Court's Solid Waste Agency of Northern Cook County v. United States ACOE, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) ("SWANCC") decision.
To supplement the statutory duty to revoke an ITP when the terms have been violated, ง 1539(a)(2)(C), FWS promulgated a regulation to retain control over the implementation of the ITP's conservation measures. The regulation authorizes FWS to reinitiate the consultation process when the "amount or extent of taking specified in the incidental take statement is exceeded" or when "[n]ew information reveals effects of the action that may affect listed species or critical habitat in a mariner or to an extent not previously considered." 50 C.F.R. ง 402.16.
During the time that the City drafted its habitat conservation plan and when FWS reviewed the application pursuant to the ESA, it was generally understood that vernal pools would be protected as "wetlands" under the CWA.[11] The MSCP expressly stated that any development that would impact a vernal pool would require a separate ง 404 permit from the ACOE, and that, pursuant to ง 7 of the ESA, the Corps would consult with FWS to establish the mitigation measures. AR 19348, 39517-18 (MSCP ง 3.2.1), 39524-25. By regulation, the ACOE had extended its jurisdictional reach to include "isolated wetlands." 33 C.F.R. ง 323.2(a)(5) (1978). FWS issued the City's ITP on the understanding that vernal pools fell within this regulatory definition, thus, any disturbance of a vernal pool that equated with filling its basin would also require a CWA permit. AR 26269-71, 26284-88 (BiOp), 26960-61 (ITP ถถ D, F, & G), 26966-69. The ITP set forth that explicit requirement in Condition I. AR 26964.[12] That *1131 assumption was subsequently extinguished by the Supreme Court.
In 2001 โ three years after the FWS issued the City's ITP โ the Supreme Court announced a decision that defeats the assumption that the ACOE would participate in any regulation of the vernal pools in Southern California. In SWANCC, 531 U.S. at 171, 121 S.Ct. 675, the Supreme Court held that the ACOE did not have authority to regulate abandoned sand and gravel pits that seasonally filled with water and were physically isolated within a single state merely because migratory birds used such waters. After SWANCC, the precise contours of federal jurisdiction over wetlands in general and vernal pools in particular remain unclear. E.g., United States v. Rapanos, 339 F.3d 447, 450-53 (6th Cir2003) (applying SWANCC and concluding the wetlands at issue had a sufficient nexus and hydrological connection to navigable waters so as to fall within CWA jurisdiction). But it is clear to this Court that the ACOE will not undertake review through its CWA permit process of impacts to isolated vernal pools that seasonally fill with water on San Diego's mesas. Borden Ranch Partnership v. United States ACOE, 261 F.3d 810, 816 (9th Cir. 2001) (ACOE withdrew its claim that it had regulatory authority over one isolated vernal pool), aff'd by an equally divided court 537 U.S. 99, 123 S.Ct. 599, 154 L.Ed.2d 508 (2002) (per curiam). Therefore, the, essential mechanism through which the impacts to vernal pools species in this case would be assessed, scrutinized, and mitigated has been removed.
Condition I was imperative to protect the vernal pool species. The AR is undisputed in that regard. E.g., AR 12802-03, 12833-34, 22446, 23721-22, 26285-88, 35680. FWS's decision to issue the ITP was predicated upon future agency review; however, the Supreme Court's SWANCC decision has closed the door to those essential future proceedings for vernal pools. The Court holds that the elimination of the anticipated future proceedings, at which time FWS would evaluate the impact of a particular project on the fate of the vernal *1132 pool species, requires the agency to reinitiate review of the substantive protections for the vernal pool species in San Diego. ง 1539; 50 C.F.R. ง 402.16. On remand, FWS shall evaluate the impacts of the City's HCP on the seven vernal pool species. The Court agrees with the Federal Defendants' position that, "[d]uring or after that reinitiated consultation, the Service can consider whether it needs to seek modification or withdrawal of the MSCP, Subarea Plan, or ITP, with regard to covered vernal pool species, in accordance with applicable laws." Fed. Defs.' Cross Mot. for Summ. J. Br. at 50.
The Federal Defendants argue that the language of the re-initiation regulation does not apply in this situation because the regulation applies when facts concerning the species have changed, and here, the law has changed. The Court does not accept this characterization. The Supreme Court's SWANCC decision closed the ACOE's door to the vernal pool species. The City's ITP dictated that adverse affects on vernal pool species must be considered during the CWA permit process. But, under the rule announced by the Supreme Court, the ACOE will not exercise its jurisdiction over the vernal pools, and the applicant will be turned away. The CWA ง 404 permit process, with its scientific review and assessment of the biological needs of the wetlands, will not be conducted. The facts have changed because the CWA protection route is closed. This constitutes new information that had not previously been considered that absolutely will effect the treatment, agency oversight, and implementation of mitigation and conservation measures of the vernal pools.
Alternatively, the regulations require ง 7 consultation to be re-initiated when the action is modified in 'a manner that causes effects to listed species or critical habitat that were not previously considered. 50 C.F.R. 402.16. Here, the City's action to implement its HCP has been significantly altered because it will no longer require development projects affecting isolated wetlands to pursue a ง 404 CWA permit. The City cannot seek the expert advice of the ACOE when deciding how to handle isolated wetlands that support vernal pools. SWANCC has resulted in a modification of the implementation of the HCP and compliance with the ITP. The absence of future consultations under the CWA, as well as the companion consultation with FWS, will absolutely affect the vernal pool species and its critical habitat. The Court finds that this regulation also supports the conclusion that FWS must reinitiate consultation on the City's ITP for the vernal pool species.
If the SWANCC decision does eliminate the ACOE's CWA jurisdiction over certain vernal pools, the Court rejects the Federal Defendants' related argument that the ITP now, by default, requires development projects to go through the ESA ง 10 permit process.[13] While courts should defer to reasonable interpretations by the agency that issued the permit, the Federal Defendants' position is unreasonable because the ITP does not provide such a default procedure, and the Federal Defendants' argument would require the Court *1133 to re-write the permit to insert such a default procedure into the ITP.
Conversely, the Court rejects the Builder Intervenors' untenable argument that SWANCC means that developers may effect the vernal pool species by complying with the measures in the MSCP and Subarea Plan. Those vague and porous protections are absolutely inadequate to minimize and mitigate harm to the vernal pool species. As construed, by the Court, the City's ITP expressly stated that vernal pool wetland species, as, that jurisdictional line was then understood, would be the subject of the, permit process of ง 404 of the CWA, which included a further ง 7 inter-agency consultation with. FWS for compliance with the ESA. The Builder Intervenors argue that now that the Supreme Court has eliminated the ACOE's authority to regulate isolated bodies of water, such as the seasonal vernal pools, the ITP can be read to grant take authority for the vernal pool species. The Court rejects this assertion as it is contrary to the evidence in the administrative record, the intent of FWS in issuing the permit, and a reasonable interpretation of the special conditions in the permit The Builder Intervenors seek a windfall. The Court denies the Builder Intervenors' request to "rewrite" or "reissue" the permit. The proper course is for the expert agency, in the first instance, to consider what protections are necessary when a specific development will affect the seven vulnerable vernal pool species.
2. Builder Intervenors' Cross Complaint Lacks Merit
The Builder Intervenors' offer their own interpretation of Condition I, and their Cross Complaint contains three causes of action regarding the scope of the take authority. First, they claim that the City's ITP, as issued, does provide authority to take the seven vernal pool species so long as the development project complies with the terms in the MSCP and Subarea Plan. Cross Compl. ถ 36. Second, they argue FWS is legally compelled to issue a new ITP that is consistent with their interpretation. Cross Compl. ถ 40. Third, the Builder Intervenors seek an injunction to order the Federal Defendants to issue such a permit. Cross Compl. at 16, ถ 3. These arguments lack merit, and the Court denies their motion for summary judgment in its entirety.
The Builder Intervenors first argue that language in the IA bound FWS to allow take of the vernal pool species. In their view, the IA's list of "Covered Species Subject to Incidental Take" means that the ITP โ presently and immediately โ grants take authority for all species on that list, including the seven vernal pool species, so long as the particular development project is consistent with the City's MSCP. AR 26544-45, 26596 (IA ง 1.4 & Exs. C & D).[14]
The Court rejects this argument because the ITP, not the IA, defines the extent of take authorized. The Builder Intervenors rely on a simplistic reading of the phrase "Covered Species Subject to Incidental Take" in the IA as if, by itself, it grants incidental take over those species. The phrase "Covered Species Subject to Incidental Take," however, is a term of art and is specifically defined in the IA and the related documents.
The protections of the ESA apply only to those species that are officially "listed" as either "threatened" or "endangered." ง 1533. Over time, those listings change, for example, as FWS receives and acts upon applications to list a species. In *1134 order to ensure flexibility, a HCP often studies any and all species that are "of concern," whether or not they are currently listed on the ESA. This over-inclusive planning ensures the viability of the conservation plan over time; may even prevent the need to list a species on the ESA; and benefits the health of the ecosystem since species are often interrelated and codependent upon common resources. See generally H.R.Rep. No. 97-835, at 30 (1982). The regional planning involved m this litigation also contemplated that the San Diego area was the home to sensitive species that might be candidates for listing under the ESA. E.g., AR 26544-45 (San Diego's MSCP plants and animal species in the San Diego region includes those that "have been listed as threatened or endangered, have been proposed for listing as threatened or endangered, are candidates for listing as threatened or endangered, or which are otherwise of concern.") (emphasis added). Thus it was prescient to include protections in the fifty-year plan. For example, the planning process considered the spreading navarretia species, even though that plant was listed as "threatened" well over a year after FWS issued the City's ITP. 63 Fed.Reg. 54975.
To further distinguish between the species under examination, or "covered," the IA, defined two categories: (1) the broader group of "Covered Species" and (2) the narrower group of "Covered Species Subject to Incidental Take." "Covered Species" are defined as "those which will be adequately conserved by the MSCP when the MSCP is implemented through the subarea plans or will be adequately conserved through the permitting process" of CWA ง 404. AR 26547 (IA ง 2.6) (emphasis added). By contrast, "Covered Species Subject to Incidental Take" are "those Covered Species which are adequately conserved by the Subarea Plan, and which are therefore subject to Incidental Take under the Take Authorization issued in conjunction with this [Implementing] Agreement." AR 26547-48 (IA ง 2.7) (emphasis added). In turn, "take authorization" is defined as "the Section 10(a) Permit," AR 26551 (IA ง 2.32) (emphasis added). Thus, further reinforcing the City's ITP as the document that defines the extent and scope of the incidental take authority.
But "coverage" does not necessarily mean that the ITP authorizes incidental take of the species because any take authorization depends upon the terms of the permit. And, as stated above, Condition I of the City's ITP expressly excluded take authorization of the vernal pool species (when within the jurisdiction of the ACOE as all vernal pools were then thought to be).
Read in the proper context, the phrase "Covered Species Subject to Incidental Take" refers to those animal and plant species "adequately conserved" by the City's Subarea Plan (either alone or in combination with another entity's Subarea Plan). As the Federal Defendants explain, the phrase is "a proxy for species that are `adequately conserved' under the Plan. Thus, the phrase was meant to identify those species adequately, conserved that would receive assurances. This presents a wholly separate question from what the Plan itself requires for a species to be regarded as `adequately conserved.'" Fed. Defs.' Mot. to Dismiss Reply Br. at 6; see also Fed. Defs.' Alt. Summ. J. Mot. Br. at 7-8 & n. 3. And as discussed, the ITP and IA expressly required a ง 7 consultation process between the ACOE (through the CWA ง 404 permit proceedings) and FWS to evaluate whether any take of the vernal pool species would be authorized on a particular development project.
The Builder Intervenors argue that the Federal Defendants' interpretation of Condition I does not make sense and that it actually threatens other species dependent *1135 upon wetlands. They note that Condition I of the ITP refers to "wetland species." AR 26964. There are 30 plant and wildlife species on the list of "wetland species" โ the seven-vernal pool species in this suit and an additional 23 species that are also "associated or dependent" upon "wetlands" (as that term was understood for purposes of ACOE jurisdiction). Id. The Builder Intervenors see incongruent results if only the vernal pool species require additional protections. For example, they argue that the government's interpretation would mean that a Southwestern willow, flycatcher would be protected from harm while it was standing in a vernal pool but not while it temporarily perched on a nearby fence post. Builder Intervenors' Mot. for Summ. J. Br. on Cross Compl. at 38-40.
The Court rejects this argument because it ignores the fact that the Southwestern willow flycatcher, like all of the 28 wetland species, is "associated with or dependent upon" wetlands, and therefore, is protected by Condition I regardless of where the bird is found or how far 'it travels.
The Builder Intervenors also argue that FWS has conflated the terms of the CWA with the ESA. The Court disagrees. The Federal Defendants have simply recognized that this lawsuit concerns only the seven vernal pool species (which were thought to reside in "wetlands" as the ACOE had broadly construed its jurisdiction), and that Plaintiffs have not challenged the ITP take authority for other wetland species or non-wetland species.
Finally, the Builder Intervenors argue that rules of contract interpretation apply and that the parties who participated in the MSCP planning process did not anticipate Condition I. They relied on the Assurances to protect them against additional regulatory procedures, and they were taken by surprise when the provision was added at the end of the process.
The Court rejects this argument because the parties' intentions or expectations are not the issue. Rather, the legal question presented is whether FWS violated the ESA or acted arbitrarily when it imposed Condition I on the City's ITP. It did not. Tennessee Valley, 437 U.S. at 174, 98 S.Ct. 2279 (the ESA is "abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities"). There is nothing remotely unfair or arbitrary about the requirement. The ACOE did not participate in the MSCP planning process. AR 26562.
In the second cause of action, the Builder Intervenors maintain that FWS was "required" to issue an ITP that corm sponded exactly to the take proposed and described in the City's HCP. Cross Compl. ถ 40. They rely on the statutory language that if FWS finds that the HCP meets the requirements for species protection, and if the proposed impact will not threaten the continued survival of the species, then FWS "shall" issue a ง 10 permit. ง 1539(a)(2)(B); Firebaugh Canal v. United States, 203 F.3d 568, 573-74 (9th Cir. 2000).
The Court rejects. this argument. The Builder Intervenors characterize FWS's duty as a ministerial task. In their view, FWS's ง 10 findings are somehow divorced from an independent review of the merits of the applicant's HCP. E.g., Builder Intervenors' Opp'n to Fed. Defs.' Mot. to Dismiss at 8. This construction violates the ESA by eliminating FWS's duty to use its expertise to restrict the impact of the proposed project on the listed species. It would extinguish the agency's statutory authority to impose conditions, here conditions F and I, to the permit. The ESA plainly states that any "Whe permit shall contain such terms and conditions as the Secretary deems necessary or appropriate to carry out the purposes of [ง 10 ITP *1136 process]." ง 1539(a)(2)(B). No one is entitled to take authorization. The application for a permit does not define the ITP; instead the ESA states that the application identifies "such other measures that the Secretary may require as, being necessary or appropriate for purposes of the plan." Id. ง 1539(a)(2)(iv). The ITP does not need to be "in accordance" with the HCP; rather the reverse is true and FWS determines the terms and conditions under which the applicant obtains an exception to' the ESA ง 9 take prohibition. Cf. Bennett v. Spear, 520 U.S. 154, 172-73, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (when ESA mandates an action, the Secretary must use his expert discretion to apply the relevant factors and follow the required procedures). Because the second claim for relief fails, it follows that the Builder Intervenors are not entitled to the injunction they request in the third cause of action. Cross Compl. at 16, ถ 3.
3. FWS's Recovery Plan for Vernal Pools of Southern California
Plaintiffs allege that FWS has violated its own regulation by failing to re-initiate consultation on the City's July 1997 ITP once FWS completed the recovery plan for vernal pool species in September 1998. TAC ถ 88-93; AR XXXXX-XXX (Fed. Defs.' Ex. M) (hereinafter "Vernal Pool Recovery Plan").
The Court is troubled that FWS is significantly behind schedule with the completion of the recovery plans.[15] The statutory scheme contemplates orderly and timely progression of action to list the species; designate its critical habitat; and create a recovery plan. ง 1533; NRDC v. United States Dep't of Interior, 113 F.3d 1121, 1125-26 (9th Cir.1997); Oregon Natural, 6 F.Supp.2d at 1152 ("The ESA contains very strict and nondiscretionary timelines"). If timely completed, FWS would use the recovery plan to evaluate the sufficiency of the application for an ITP, particularly when the permit governs a large region for an extensive period of time. Cf. National Wildlife v. Babbitt, 128 F.Supp.2d at 1283 (Natomas Basin HCP included provision for incorporating the recovery plan for the endangered snake when it was developed and approved). If the terms of the ITP were inconsistent with the strategies and objectives in the recovery plan, then FWS would need to explain why it reached inconsistent conclusions from the same evidence. Defenders of Wildlife, 420 F.3d at 959; National Wildlife Fed'n v. National Marine Fisheries Serv., 422 F.3d 782, 799 (9th Cir.2005) (deference is not owed when agency fails to adhere to a consistent view). The Vernal Pool Recovery Plan is pertinent evidence of the measures necessary to prevent the extinction of the vernal *1137 pool species. The language and structure of the ESA's provisions for recovery plans shows that FWS must make a conscientious and educated effort to implement the plans for the recovery of the species.[16] ง 1533(f)(1) ("The Secretary shall develop and implement" recovery plans for the "conservation and recovery" of the listed species unless "such a plan will not promote the conservation of the species."). The statute gives the Secretary leeway by including the phrase "to the maximum extent practicable." ง 1533(f)(1)(B). Accordingly, during the re-initiation process ordered by this Court in response to the SWANCC decision, FWS must consider the standards and other information in its Vernal Pool Recovery Plan to evaluate the effect of the City's ITP on the vernal pool species and whether the mitigation is adequate.
B. FWS Failed to Consider the Issue of "Unnatural" Vernal Pool Habitat
In rare instances, vernal pool species have been found in "unnatural" areas, for example, in a rut left by a tire track, a roadside ditch, or a cattle stockpond. The biological explanation for these "unnatural" occurrences is that the area was once a healthy vernal pool complex, but over time, it was degraded by human activity (such as off-road vehicle use or scraping for construction) to the point of virtual destruction. AR 32465-67; 63 Fed.Reg. at *1138 54975; 59 Fed.Reg. 64812, 64814; see 62 Fed.Reg. at 4926 (alternatively, the fairy shrimp eggs may be distributed by birds, or nearby habitat may be washed into an adjacent area during heavy rains). Over time, if that area is left relatively undisturbed and rains fill these "man-made" depressions with fresh water, then the species may re-vitalize, for example, some fairy shrimps' eggs may have survived a few years in their dormant state in those damaged soils. 62 Fed.Reg. at 4926, 4930; AR 32466-67. While the parties refer to these instances as being "unnatural," it is more accurate to describe them as "survivors" of a degraded habitat.
The City's conservation plans distinguish between "naturally occurring" vernal pools, and "road rut" vernal pools; and also provides greater protection to vernal pools within the Preserve boundaries than those located outside the Preserve. "Outside the MHPA, narrow endemic species [including four vernal pool plant species] will be protected through the following measures, as deemed appropriate:, 1) avoidance; 2) management; 3) enhancement; and/or 4) transplantation to areas identified for preservation." AR 24955. According to the `Federal Defendants, the only vernal pools affected by this sentence are those unnaturally occurring in road ruts, tire tracks, or water ponds. The Federal Defendants characterize the amount of take authorized by this sentence as "largely theoretical" or "negligible." E.g., Fed. Defs.' Cross Mot. Summ. J. Br. at 1, 3, 14-16, 23, 34, 38.
Plaintiffs argue that FWS did not analyze the impact of the taking of these "unnatural" instances of vernal pool species. "FWS simply ignored this issue altogether." Pls.' Br. at 41.
The Court agrees. A decision is arbitrary if the agency "entirely failed to consider an important aspect of the problem." Motor Vehicle, 463 U.S. at 43, 103 S.Ct. 2856. FWS authorized the take of vernal pool species when found in these "unnatural" locations in Condition I by authorizing the City to take vernal pool species "outside" of "jurisdictional wetlands." But there is no discussion or evaluation of the impact of the adverse effects on those rare instances in the context of the survival of the species as a whole. It appears, that as a matter of convenience, FWS concluded that these errant locations of species or habitat would not constitute wetlands, even under the ACOE's definition that its CWA jurisdiction encompassed isolated bodies of water. Yet the record contains no discussion of the reason for this distinction for purposes of enforcing the ESA. It is arbitrary to distinguish between vernal pools within or outside the ACOE's wetlands jurisdiction as a basis for providing different levels of protection for the endangered species that may inhabit or rely upon those bodies of water.
Similarly, the Court finds that the agency, has not adequately explained its decision and has not based its decision on facts in the record. Citizens to Preserve, 401 U.S. at 415, 91 S.Ct. 814. The record shows that, against all odds, vernal pools can sometimes survive on a damaged location, and the dormant cysts of the fairy shrimp may hatch several years later. Given the exceptionally small number of vernal pool species that may still be viable in San Diego, it defies reason to give less protection to those creatures and plants that have survived some measure of damage by human activity, as these would appear to be among the more hearty specimens. A "road rut" vernal pool has most likely been damaged in violation of the strict ESA take prohibition but have survived that disruption. It is arbitrary to assume that surviving vernal pools need less protection than those that exist in relatively pristine and less developed settings. FWS has the statutory duty to *1139 protect the threatened and endangered vernal pool species that now reside in those degraded habitat areas. Despite the prior harm, these vernal pools have regained their capacity to sustain life. Yet FWS gives these hearty, surviving species less protection that other vernal pools simply because those pools were considered to be within the jurisdiction of the CWA.
C. The Assurances Violate the ESA by Locking in Inadequate, Unproven, and Uncertain Mitigation Measures for the Seven Vernal Pool Species
The next issue concerns the operation of the "Assurances" on the seven vernal pool species in light of FWS's decision to defer analysis of the direct and indirect impacts of development under the MSCP until future ง 7 consultations with the ACOE. The Assurances prohibit FWS from imposing additional conservation measures beyond those measures contained in the City's HCP during the fifty-year life of the ITP. FWS will not require additional land, land restrictions, money, conservation measures, or mitigation from the City or a developer (by virtue of their Third Party Beneficiary status). AR 26555-56 (IA ง 9.4, 9.5). FWS agreed to step in to fill any void to bear the financial burden because it expected that the likelihood of such an event would be "small." AR 26933 (Findings); see also AR 26200, 26210 (BiOp states that FWS will "request and receive" funding "needed to assure adequate conservation of covered species in perpetuity"). The structural problem is FWS did not evaluate the impact of the conservation plan, such as the design of the Preserve or the methods and measures of mitigation, as applied to the vernal pool species at the initial stage of issuing the ITP because it did not anticipate any take under Condition I; yet, FWS promised that when a particular project is reviewed in the future, FWS will only enforce the mitigation measures that are in that unexamined HCP. The Court agrees with Plaintiffs' characterization of the structure of the Assurances on the facts of this case as creating a "shell game" in which FWS effectively eliminates the ESA protections for vernal pools by promising to protect them in the future at the same time it restricts its authority to those unevaluated measures set forth in the MSCP and Subarea Plan.
At the time of issuing the ITP, FWS assumed it need not evaluate the extent of the possible impact or the level of mitigation because in the future FWS would have considered if a particular project would jeopardize the vernal pool species in conjunction with the CWA permit process. E.g., AR 26285-88 (direct impacts for all seven vernal pool species "will be addressed" in future analyses); cf. AR 24146-47 (in early draft, FWS believed it had retained right to, impose additional mitigation measures during future ง 404 proceedings with ACOE). Pursuant to Condition I, FWS would consult with the ACOE to address specific species needs on specific development projects. But the record shows that the future proceedings would be empty because FWS gave away its power to protect the species in the Assurances. If FWS found that a specific development project would impair the recovery of a vernal pool species, and recommended modifications to the planned development to prevent that harm, the developer has no obligation to provide any of those mitigation measures. AR 26561-61 (IA ง 9.8A). FWS would be talking into the wind because the developer, protected by the City's authority to issue an ITP for that project, is assured that it does not have to provide those additional measures.
Even putting aside the fact that SWANCC has eliminated the procedure of turning to the ACOE for a wetland permit that would trigger a future ง 7 ESA consultation *1140 with FWS, the structure of this agency action is fundamentally flawed when applied, to the vernal pool species. The egregious flaw remains because FWS has not analyzed the impact of the City's development plans on the vernal pool species (because it planned to undertake that evaluation in conjunction with the ง 7 consultation proceedings with the ACOE CWA permit process), yet it has locked in the level and extent of mitigation. The MSCP is structured to create a Preserve, which eventually may contain 847 acres of the remaining vernal pool habitat, but allows the City to authorize virtually unfettered development on the 336 acres located outside the Preserve. (The regulated destruction outside the Preserve would be mitigated by remedial actions to vernal pools within the Preserve). Notably, FWS has not evaluated the design of the permanent Preserve to determine if it would mitigate the expected harm to the vernal pool species outside the Preserve. There is no indication that the acres selected for preservation are occupied by viable populations of fairy shrimp. Thus, the basis for granting the Assurances is devoid of any evaluation of the impact, but by the time FWS intends to evaluate that site-specific impact, it will have no ability to suggest or impose any additional measures.
The AR bears out Plaintiffs' assertion of how the implementation of the conservation plan and FWS's supervision of the mitigation efforts will operate because both the standard to "avoid" and the type of mitigation are flawed. First, the duty to "avoid" vernal pools is toothless. The Federal Defendants and Builder Intervenors insist that the Plaintiffs' position lacks merit because of the significant protections in the City's conservation plan to "avoid" vernal pool habitat. They, cite the standard in the MSCP and Subarea plan to "avoid" vernal pools whether located in or outside of the planned Preserve; the adoption of the CWA's "no net loss" policy; and the City's Environmentally Sensitive Lands Ordinance ("ESLO"). E.g., AR 23721 ("avoidance of impacts . . . to the maximum extent feasible"), 24955 (Subarea Plan stated that vernal pools in naturally occurring complexes inside the Preserve "will be avoided"; vernal pools within and outside the Preserve will be avoided "to maximum extent practicable"); AR 25724-60 (ESLO); accord AR 19352, 22446, 23340-41 (draft EIS), 23966-68, 25227, 26912, 26914 (FWS Findings relies on directive to "avoid" impacts "where possible" and to mitigate "unavoidable" impacts "to the maximum extent practicable"), 26271, 26284-88 (same in BiOp), 26571(IA), 39523 (MSCP ง 3.3.3). The Court has examined each of these provisions and finds them utterly otiose. Each avoidance standard allows the City or developer to unilaterally determine that a particular development project cannot avoid the vernal pools on the proposed construction site. Both the City and developers have a strong financial interest in obtaining the highest financial return on expensive real estate, and neither has the expertise or incentive to contemplate the ESA protections.[17] By simple *1141 ipse dixit, the City or developer can proclaim that avoidance of the vernal pools is not possible on the site, and thus shift their attention to providing the mitigation outlined in the MSCP.
The "no net loss" standard illustrates the flaccidity of the avoidance standard in the HCP. See infra pp. 1149-1151 & nn. 19 & 20. The uncontradicted evidence in the record confirms that the "no net loss" standard, is inadequate to protect the vernal pool species. FWS determined that these seven fragile species required the procedural and substantive protections of the ESA because, in part, the CWA was not preventing harm. The HCP defines a "no net loss" of functions and values standard with a broad practicality exception. Here, the "no net loss" policy permits the substitution of off-site mitigation whenever on-site mitigation is "impracticable." Nothing suggests that merely drafting a development plan that envisions using the entire plot could render on-site mitigation "impracticable." E.g., AR 30094 (Cousins resulted in 100% loss of vernal pools on the 67-acre site). Unlike the ESA, which broadly prohibits harm "in the broadest possible manner to include every conceivable way in which a. person can `take" a species, Forest Conservation, 50 F.3d at 784, the "no net loss" policy would permit such harm as long as another, comparable body of water is restored.
Similarly, the City's ESLO favors development. The Ordinance states simply that "impacts to wetlands should be avoided." AR 25730. The term is not defined and merely offers a suggestion that development "should" avoid the vernal pools. "Examples of unavoidable impacts include those necessary to allow reasonable use of a parcel entirely constrained by wetlands," AR 25731, 23351-52, thereby allowing development of a large complex of interrelated vernal pools when that provides the healthiest environment for these species. The ESLO allows the developer to define the scope of what can be "avoided," thus, the inclusion of upland watershed is equally ineffectual. If you can't "avoid" a vernal pool, it is irrelevant that a developer should have "avoided" the watershed acreage that supported that habitat. These passing, undefined references to "avoidance" do not satisfy the ESA, which affords imperiled species the "highest of priorities." Tennessee Valley, 437 U.S. at 174, 98 S.Ct. 2279.
The weakness of the obligation to "avoid" vernal pools is then purportedly recompensed, but in fact, the approved mitigation measures are uncertain and inadequate. National Wildlife Fed'n v. National Marine Fisheries Serv., 254 F.Supp.2d 1196, 1214 (D.Or.2008) (a properly supported BiOp cannot rely on mitigation that is not reasonably certain to occur). The Federal Defendants and Builder Intervenors stress that when vernal pool habitat is destroyed, the MSCP imposes significant mitigation responsibilities. The problem with the proposed mitigation for the two fairy shrimp, however, is that they either have been proven to be ineffective or they are untested experiments.[18] The City's conservation plans concentrate on collecting species from the site of the development and transplanting them to a site within the Preserve, e.g., *1142 AR 19627-28, 19678, 24859-60, 24909, but the record establishes that fairy shrimp cannot be successfully transplanted, and, even if successful, it risks hybridization with other species of fairy shrimp. FWS reached that conclusion in February 1997, just a few months before it approved the proposed mitigation method in the MSCP. 62 Fed.Reg. at 4926, 4931 (no scientific data on method of inoculating an existing pool with a known quantity of eggs in face of threat of hybridization, damage to eggs during collection, storage, and transportation; efforts to restore this fragile habitat can fail when the depth of the pool is altered or the pool is modified to hold water for an inappropriate length of time). The City's ESLO states that "creation" is an acceptable type of mitigation, e.g., AR 25747, yet FWS has completely rejected that method as ineffective. See also Cousins' Opp. to TRO at 3-4 (ACOE approved mitigation package that included "creation" of vernal pool basins and relocation of fairy shrimp eggs). Because FWS is bound by the Assurances not to require additional mitigation measures โ even if over time, biologists learn new and better ways to protect the species or conversely, if time shows certain restoration methods fail โ FWS would not be able to require the developer to accommodate these new scientific advances into the mitigation measures because the Assurances have frozen the state of knowledge to that known as of 1997. In short, the destruction is permanent and the "mitigation" is illusory.
This situation is analogous to the problem addressed in the Ninth Circuit's decision in Conner v. Burford, 848 F.2d 1441, 1457-58 (9th Cir.1988). Plaintiffs argue that FWS violated the ESA by failing to consider the entire agency action in its Biological Opinion (Bi0p). FWS did not include any analysis of the direct or indirect impacts on vernal pool species of the City's conservation plan; instead, FWS deferred that analysis to the future ง 404 CWA permitting process. Plaintiffs argue this approach "artificially narrowed the scope of its review by claiming the required analysis of direct impacts will be performed during future site-specific section 7 consultations." Pls.' Summ. J. Br. at 37. But this was an empty promise because "the City's HCP controlled and limited these future consultations. First, in establishing a 12% cap in the City's HCP on the additional loss of vernal pool habitat, FWS must approve all future projects provided this 12% limit is not reached." Id. at 38. Second, the Assurances prevented FWS from recommending or requiring any additional mitigation measures not contemplated and included in the MSCP and Subarea Plans. Id. "Consequently, future section 7 consultations will merely `rubber stamp' each project consistent with the City's HCP." Id.
The Court concludes that the BiOP violates the guiding principle of the Ninth Circuit's Conner decision. The ESA "does not permit the incremental-step approach" of consultation because "biological opinions must be coextensive with the agency action." Conner, 848 F.2d at 1457-58; accord Center for Biological Diversity v. Rumsfeld, 198 F.Supp.2d 1139, 1155 (D.Ariz.2002); Greenpeace v. National Marine Fisheries Serv., 80 F.Supp.2d 1137, 1143-45 (W.D.Wash.2000). "[T]he ESA requires that all impacts of agency action โ both present and future effects on species โ be addressed in the consultation's jeopardy analysis." American Rivers v. United States ACOE, 271 F.Supp.2d 230, 255 (D.D.C.2003). This rule ensures that the ESA is enforced in an effective manner because "impermissible segmentation would allow agencies to engage in a series of limited consultations without ever undertaking a comprehensive assessment of the impacts of their overall activity on protected species." Id. (emphasis added).
*1143 The lesson of Conner applies to this case because the ESA's policy of "institutionalized caution," Tennessee Valley, 437 U.S. at 194, 98 S.Ct. 2279, "can only be exercised if the agency takes a look at all the possible ramifications of the agency action." Conner, 848 F.2d at 1453 (quotation and citation omitted). Though FWS chose not to evaluate the cumulative impact of the implementation of the MSCP and Subarea Plan on the vernal pool species, it fixed the ameliorative measures for the fifty-year life of the ITP to those contemplated in 1997. Ironically, this structure diminishes the value of one of the primary strengths of regional conservation planning โ enabling jurisdictions to plan and implement protections for an entire ecosystem. E.g., AR 6780-82, 23189-90, 28100-01, 39463. By the time FWS undertakes its incremental site-specific consultations it may have lost the opportunity to protect the vernal pool species from extinction. Conner, 848 F.2d at 1454-58 (requiring comprehensive information and review "to avoid piecemeal chipping away of habitat"). The flaw is fatal in the context of this case because all vernal pool habitat outside of the San Diego region has been destroyed. E.g., AR 26236 ("The loss of vernal pool habitat is nearly total in Los Angeles, Riverside, and Orange counties"); 63 Fed.Reg. at 54983-84; 58 Fed.Reg. at 41387 (otay mesa mint). The "vernal pool species have narrow and strict habitat requirements. E.g., 58 Fed.Reg. at 41388 (Riverside fairy shrimp); 62 Fed.Reg. at 4929 (San Diego fairy shrimp). The remaining habitat is found within the area covered by the MSCP (and lands controlled by the military). Because the MSCP controls the fate of the remaining vernal pool habitat throughout all of its range, it is particularly important to comply with the purpose and spirit of the ESA to seek to prevent the extinction of these species.[19]
Federal Defendants argue that the framework of Condition I of the ITP, the MSCP, and the Subarea Plan is more akin to Swan View Coalition v. Turner, 824 F.Supp. 923, 934-35 (D.Mont.1992), where the district court approved reliance on future agency proceedings at subsequent stages. This case, assuming that it was correctly decided, is distinguishable because the future permit proceedings were "in addition to the analysis already done" at the time FWS issued the permit. Id. at 935. By contrast, here, FWS did not anticipate any take of the vernal pool species at the time it issued the permit, thus, did not evaluate whether the HCP would adversely affect these species nor the adequacy of the proposed mitigation measures.
*1144 The violation of the conservation goals of the ESA is illustrated by comparing the Assurances offered in this case to those offered under the paradigm approach described by Congress and approved by other courts. H.R.Rep. No. 97-835, at 30-32 (1982), reprinted in U.S.C.C.A.N. 2807. The model paradigms include constant monitoring and revision based on that data, but that safety feature is absent from the MSCP and Subarea Plans. The omission of flexible monitoring features is exacerbated because the large scale and long term of the City's ITP. Id. at 31 (noting that permits lasting 30 or more years may be appropriate but FWS must consider the possible negative effects associated with such a duration, and "the extent to which the conservation plan is likely to enhance the habitat of the listed species or increase the long-term survivability of the species or its ecosystem"); cf. Jantzen, 760 F.2d at 983 (permit for one species on one mountain could be reconsidered based upon data revealed by the monitoring). Congress expected that FWS would pay particular attention to both the benefits of such a long-term permit (e.g., allowing time to assemble a large, integrated permanent preserve) against the negative consequences (e.g., locking the mitigation measures to those known as of 1997, rather than permitting the species to benefit from the developing science and experience on specific sites). The San Bruno mountain butterfly conservation plan had specific biological goals that were created after two years of biological study of the proposed development's effect on the butterfly species; it required specific and constant monitoring of the butterfly; and if time revealed that the species was suffering more than expected and permitted, the plan provided for adaptive management techniques that would remedy the problem before allowing further harm to the species. Jantzen, 760 F.2d at 979 & 983.
Similarly, a developer's conservation plan for a hawk and a snake in the Natomas Basin near Sacramento was based on "adaptive management." National Wildlife v. Babbitt, 128 F.Supp.2d at 1281-82. The conservation plan acknowledged that the imperfect state of knowledge of the needs of protected species, and that, over time, the assumptions in the conservation plan may prove inaccurate. Id. Like the City's MSCP plan, this was a fifty-year plan in an area experiencing rapid and extensive development and growth. The district court noted that part of the regional plan that permitted future adjustments based on new information acquired on the two species over the life of the permit, but invalidated the city's local plan that did not contain features for correction and reconsideration. Id. at 1299-1300. In the regional plan, modification could be triggered, by new research on the species, recovery strategies as formulated by FWS's recovery plan, and information gathering pursuant to the monitoring obligations. Id. at 1282. There was an agreement to monitor the entire system every five years to assess the effectiveness of meeting the conservation goals, and periodic technical monitoring to assess the effectiveness of specific management and enhancement programs. Id. In addition, the regional conservation plan contemplated a comprehensive regional assessment to ensure the plan was meeting the specific conservation goals for the species as development occurred and the preserve was assembled. Id. The MSCP in this case does not contain these adaptive management protections that would ensure that the vernal pool species would be effectively conserved; instead, the assurances operate to lock in weakened safeguards for the vernal pool species for fifty years. The purpose of the ESA "is not simply to memorialize species that are on the path to extinction, but also to compel those *1145 changes needed to save the species from extinction." Oregon Natural, 6 F.Supp.2d at 1152.
Congress added the ง 10 ITP process to the ESA to provide incentives to private landowners to commit resources to implement long-term HCPs, but it also expected FWS to comply with the broad conservation goals of the ESA. While Congress contemplated assurances to developers that they would be required only to provide the explicit measures in the conservation plan, Congress envisioned that such plans would provide for unforeseen circumstances that threatened the survival and recovery of the species covered by the long-term plan. H.R. Rep. at 31. Here, there is an exception for "extraordinary" or "unforeseen" circumstances, but FWS again promised that if additional conservation were warranted under this provision that they "shall not involve the commitment of additional land or additional land restrictions or additional financial compensation" by the City or the developers. AR 26557 (IA ง 9.6(E)). Further, if FWS determined that additional conservation measures were necessary, they "shall be limited to modification of the. City of San Diego's preserve management program or habitat acquisition program as set forth in the Subarea Plan." Id.
It is particularly troubling when FWS did not scrutinize the conservation plan for impacts to the vernal pool species. The result is that FWS has given Assurances to the City (and developers who will obtain permits from the City) without the stabilizing balance of protecting the species from extinction. For example, if, during the next fifty years, biologists confirm that restoration attempts such as transplanting fairy shrimp cysts is unsuccessful, the Assurances forbid the City or FWS from obtaining additional financial contributions, land restrictions, or other mitigation. Further, FWS would bear the burden of proving the species was in jeopardy by clear and convincing evidence. AR 26566 (IA ง 9.6(C)). The unforeseen circumstances provision has been stripped of its meaning. These consequences seem likely to happen, since the scientific data in the AR shows that the vernal pool species will be damaged by the fragmentation and edge-effects of the continued, rapid development of the San Diego region. Thus, as development proceeds under the MSCP, the indirect harm to the vernal pools intensifies. Yet, FWS will not require the developers who obtain permission to take the species to repair that compounding damage to the listed species.
At the hearing, the Federal Defendants assured the Court that several levels of protection remained and FWS would step in to protect the species from extinction by exercising its eminent domain power or revoking the permit. But FWS limited its authority to revoke the. City's ITP in the IA. AR26557 (IA ง 9.6(E)). Such an extreme remedy does not replace the duty of FWS not to issue an ITP when the benefits to development outweigh the detriment to the vernal pool species. See Defenders of Wildlife, 420 F.3d at 954, 974-75 (after-the-fact enforcement of ESA ง 9 prohibition on take is not an adequate substitute for preventing threat to species, especially plants). The flaw in the City's ITP is structural.
The Builder Intervenors stress that they have agreed to contribute valuable property to assemble the Preserve, and this overall benefit for the region justifies the Assurances. This logic is flawed, however, because if a vernal pool species is present on a parcel of property, development that would kill, destroy, or harm those species would be barred under the ง 9 of the ESA. A properly supported ITP would ensure that the regulated kill could proceed because the promised mitigation would not *1146 jeopardize the chance for the vernal pools to recover to the point that they no longer need the protection of the ESA. The record in this case shows that FWS has not evaluated how the contemplated development of lands containing vernal pool habitat will be or could be mitigated so as to authorize any level of take, thus, the Assurances are not properly applied to those species. The balance of the MSCP, Subarea Plans, and the Assurances are not affected by this litigation, and the City, the developers, and the ecosystem will benefit from the regional conservation plan as to the remaining eighty-plus fragile species in the 900 square miles covered by the City's ITP.
On this record, the Court finds that the Assurances violate the ESA because they lock-in ineffective, unstudied, and inadequate mitigation for the vernal pool species for fifty years. The ESA requires useful mitigation. Federation of Fly Fishers v. Daley, 131 F.Supp.2d 1158, 1163 (N.D.Cal. 2000). Under the terms of the City's conservation plans and its ITP, development projects certainly will go forward to graze habitat and kill species, but the commitments to "mitigate" will not protect the species in the long run. A close and careful examination of the record reveals that the plan is structured to permit unfettered take of vernal pool species and to destroy over 300 acres of its habitat, without any corresponding duty to ameliorate the damage if conditions change. The Preserve has been designed to protect 847 acres of vernal pool habitat, but the slack standard to "avoid" vernal pools outside the planned Preserve leaves unrestrained discretion to development to destroy completely the 336 acres outside the Preserve. E.g., AR 23391. While the size and design of the Preserve has been determined, FWS has not evaluated how the extent of take permitted under the conservation plan will benefit the vernal pool species. Any' developer, by virtue of its Third Party Beneficiary status under the IA, is assured that it will not have to commit any funds or resources to mitigate for the take of the vernal pool species other than those contemplated in the MSCP and Subarea Plan for fifty years, when the level of mitigation necessary to conserve the vernal pool species in San Diego county has not been evaluated, determined, or dictated. Instead, any developer need only comply with the requirements of the MSCP, effectively repealing the stricter protective ESA standards for the vernal pool species for fifty years. This result violates the ESA because it precludes FWS from making changes to the City's ITP that may be necessary to ensure the survival and recovery of the vernal pool species โ even though FWS approved the conservation plan and found "no jeopardy" on the premise that it did not anticipate any take of vernal pool species because that analysis would be conducted in future administrative proceedings. E.g., AR 26303. In sum, FWS has issued an ITP with regard to the vernal pool species that (1) will not "maximize to the extent practicable, minimize and mitigate the impacts" of those takings, and .(2) could "appreciably reduce the likelihood of the survival and recovery of the species in the wild" in clear violation of ง 10 of the ESA. ง 1539(a)(2)(B).
D. The Twelve Percent Measure for Loss of Vernal Pools is Arbitrary
Plaintiffs contend that FWS violated the ESA by approving the City's conservation plan that envisioned an additional 12% of habitat loss without analyzing the impact on the survival and recovery of the imperiled species. "The City's HCP indiscriminately caps destruction of vernal pool habitat at 12% of the total remaining acreage . . . regardless of the quality of the habitat or whether the pool is occupied by the seven vernal pool species." Pls.' Summ. J. Br. at 34. This *1147 violates ง 7 of the ESA because "FWS never analyzed the impact of losing an additional 12% of vernal pool habitat in the Biological Opinion." Id. at 39. Plaintiffs cite the IA which states that "[f]or vernal pools in naturally occurring complexes, and wetlands, impacts will be avoided to the maximum extent practicable both within and outside the [MHPA Preserve]." AR 26751 (IA ง 10.8(G)(3)). Plaintiffs characterize the "maximum extent practicable" language as a "loophole," which is converted to a firm percentage in the MSCP documents. The City designed a 171,917 acre Preserve, which was intended to conserve or "cover," among others, the seven vernal pool species. AR 19335-51 Table 3-5 of the regional MSCP Plan identifies the level of potential impact or development for each species. As evaluated by the MSCP, the San Diego and Riverside fairy shrimp were "covered" because "12% of vernal pool habitat may be impacted, but this habitat is subject to no net loss function and value and 404(b)1 guidelines." AR 22486-87 (MSCP 1996); accord id. at 22467 (San Diego button celery), 22474-75 (navarretia fossalis ), 22477-80 (14% of California Orcutt grass, 12% of San Diego mesa mint, and 9% of Otay Mesa mint, may be impacted) (see correction in Final MSCP at AR 39552 for percentage of Otay Mesa mint).
The Federal Defendants respond that the 12% figure is not a term of the ITP. The ITP did not authorize take associated with 12%, or any percentage, because FWS anticipated "virtually zero" impact on the vernal pool species. All take of such species would be assessed in future ง 404 permit proceedings and subject to the "no net loss" policy of the CWA. They argue that Table 3-5 outlines the anticipated, expected, or potential impacts, not the authorized level. FWS repeatedly emphasizes that it did not anticipate that the issuance of the ITP would result in any take of the vernal pool species (with the exception of the few pools that occurred outside the jurisdictional wetlands of the ACOE, as that definition was then known to apply to isolated bodies of water)
The Court is persuaded by Plaintiffs' position and concludes the flaw infected both FWS's ง 7 Biological Opinion and its ง 10 Findings. The Court has conducted a thorough and searching review of the AR, and finds that FWS failed to consider this important aspect of the City's conservation plan. Motor Vehicle, 463 U.S. at 43, 103 S.Ct. 2856; Citizens to Preserve, 401 U.S. at 415-16, 91 S.Ct. 814. FWS's BiOp relies on the future ง 404 CWA permits for wetlands, and the accompanying inter-agency consultation between ACOE and FWS, as a basis for approving the City's conservation plan as to vernal pools. AR 26203 ถ 4. In delineating the effects of the City's plan, FWS noted that "Table 3-5 of the MSCP Plan (Appendix A) summarizes the level of take anticipated for each Covered Species." AR 26255, 26256 (same as to "wetlands, including vernal pools in naturally occurring complexes"), 26205, 26207-08 (describing the anticipated incidental take of the species as governed by Table 3-5 of the MSCP, and the IA protecting vernal pools by requiring the City to avoid impacts to the maximum extent possible). FWS defined the percentages depending upon the level of information about the population, and noted that "precise quantification" of take was not possible. AR 26255. The BiOp analyzed potential impacts to vernal pool species without mentioning Table 3-5, the source of the 12% potential impact. AR 26284-88. In the final section of the BiOp, "[t]he Service finds that the proposed action will not appreciably reduce the likelihood of the survival and recovery of . . . San Diego fairy shrimp, or Riverside fairy shrimp, because no direct effects to these species is anticipated under the plan." AR 26295 (emphasis added) (Pls.' *1148 Ex. 11 does not include the similar page for the plant species); accord AR 26303 ("The Service anticipates no Riverside fairy shrimp [and San Diego fairy shrimp] will be killed or harmed as a result of actions proposed in the City of San Diego's Subarea Plan."). The inconsistency between the agency's expectation (no impact because future evaluation on specific sites) and the design of the City's plan (allowing from 9% to 14% direct impact on vernal pools habitat), including the percentage of vernal pool habitat that would be included in the permanent preserve, warrants an explanation as to whether the vernal pool species can withstand this much loss. AR 26284 (BiOp states that "any net loss will be significant").
The Federal Defendants' contention that the MSCP language merely discusses "potential" impact is belied by the actual and consistent application of the provision to measure the accumulated take by the City's 12% figure. The application to development projects reveals that Plaintiffs have correctly interpreted the use of the 12% provision in Table 3-5. Despite the Federal Defendants' position in this litigation to the contrary, the Court finds that FWS is authorizing the take of the vernal pool species under this 12% measure.
At this juncture, the Court must address an issue concerning the scope of the AR. Plaintiffs have submitted evidence of four agency actions taken after FWS issued the City's ITP (in July 1997) that use the 12% measure. AR XXXXX-XXX (Pls.' Ex. 19) (May 1998 BiOp on Cousins); Pls.' Ex. 3 (Feb.1999 BiOp on Route 125 on Otay Mesa); Pls.' Ex. 5 (July 1999 BiOp on Route 56); and Pls.' Ex. 4 (Sept.1999 BiOp on Brown Field). The Court hesitated to consider this information because it was created after FWS issued the City's ITP. Fund for Animals v. United States Sportsmen's Alliance Found., 391 F.Supp.2d 191, 196-200 & n. 4 (D.D.C. 2005) (to ensure fair judicial review under APA, the court "should have before it neither more nor less information than did the agency when it made its decision") (quotations and citations omitted). This concern is largely alleviated because FWS authored the BiOps. They are based upon the same data (e.g., status and threats facing the vernal pool species) and in the same context of implementing the City's ITP; therefore, the four BiOps do not raise the type of problem associated with third-party reports, new scientific data, or recent field information that was not available to the agency at the time it made its decision to issue the ITP. Cf. Miccosukee Tribe of Indians of Fla. v. United States, 396 F.Supp.2d 1327 (S.D.Fla.2005) (report showed decline of species after agency action was excluded because it "was not generated until over a year after the challenged decision"). Instead, the BiOps illustrate the FWS's reasoning on the subject involved in the decision making process of granting the City the ITP with Condition I โ whether the taking of vernal pool species and their habitat was truly "incidental" to the development activities, as defined by the ESA.
In the final analysis, the Court concludes that it is permissible to consider these four BiOps for illustrative purposes. They apply the terms of the City's ITP to real projects, thereby serving the purpose of illustrating the complexities of the densely-worded provisions in the MSCP. Southwest, 100 F.3d at 1450; see Amoco Oil v. EPA, 501 F.2d 722, 729 n. 10 (D.C.Cir.1974) (considering testimony given after agency decision because it bore "directly upon the plausibility of certain predictions made" by the EPA). The specific applications of the ITP have been very informative on the operation of the MSCP, the mitigation measures for the vernal pools, and FWS's interpretation of its ง 7 duty to consult with the ACOE on *1149 site-specific projects within the confines of the City's ITP. The. Court is not using the BiOps on specific construction sites to question the wisdom of the agency's policy decision, Fund for Animals, 391 F.Supp.2d at 196-97 & 199 n. 6; Sierra Club v. Dombeck, 161 F.Supp.2d 1052, 1062-63 (D.Ariz.2001); rather, they show the Court how FWS implemented its ITP for vernal pools in reliance on the mitigation measures in the MSCP.
The specific examples were particularly helpful in this litigation because of the litigation position taken by the Federal Defendants. Throughout their legal briefs and dining oral argument, the Federal Defendants repeatedly assured the Court that the MSCP did not operate as the Plaintiffs contended. See Citizens to Preserve, 401 U.S. at 420, 91 S.Ct. 814 (considering agency's rationalization for its decision,, which had been prepared for litigation). The Court is mindful of its obligation to defer to the agency's expertise. Sierra Club v. United States EPA 346 F.3d 955, 961 (9th Cir.2003). When the Court examined the relevant documents, however, the factual basis for the agency's assertions was either absent or masked by convoluted provisions.[20]Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("focal point for judicial review should be the administrative record already in existence" unless the record fails to explain the decision); cf. National Wildlife v. Babbitt, 128 F.Supp.2d at 1289 (expanding AR to determine if agency "swept stubborn problems . . . under the rug") (citations omitted). In order to provide effective judicial review of the agency's action, the Court is required to conduct a "searching and careful" examination to ensure that the connection is made between the facts and the agency's rationale for its decision. Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); Sierra Club, 346 F.3d at 961 ("While our deference to, the agency is significant, we may not defer to an agency decision that `is without substantial basis in fact.'").
Turning to the examples of how FWS has applied the 12% cap, Plaintiffs first point to the Cousins project in Mira Mesa. That large commercial development project destroyed all 64 vernal pools of the complex on the site, where San Diego fairy shrimp had been observed. AR 30094-95, 30133. In exchange, the developer agreed to mitigate this loss of 0.2 acres by purchasing and preserving other vernal pool sites. AR 30089-92 (identifying sites at Mesa Norte, with 23 vernal pools, and Gleitch Parcel). When FWS described the proposed development, it used the 12% figure in the MSCP as a measure:
For vernal pool species, Table 3-5 states that 88% of the vernal pool habitat will be conserved. To be consistent with the [MSCP] Plan, only 12% of the remaining habitat can be impacted. . . . If there is no avoidance of vernal pools on the project site, then this acreage will be subtracted from the projected 12% loss of habitat.
AR 30095.
This was not a one time incident. FWS used similar language in the BiOps approving State Routes, 56 and 125, and the Commerce Center at Brown Field and included *1150 a running tally of the acres that had been impacted between 1997 and 1999. Pls.' Ex. 4 at 11, 14 & Table 1 (Sept.1999 BiOp); Pls.' Ex. 5 at 8 (July 1999 BiOp);. Pls.' Ex. 3 at 8-9 (Feb.1999 BiOp of Route 125). With regard to the State Route 56 project in the Del Mar Mesa region, FWS issued a BiOp approving the ACOE's proposed CWA ง 404 permit. The project would fill eleven vernal pools, and would impact two additional pools. "San Diego fairy shrimp were detected in 9 of these pools." Pls.' Ex, 5 at 5. FWS concluded that the destruction was permitted by relying on Table 3-5 of the City's MSCP, which is the source of the 12% measure:
For vernal pool species, Table 3-5 state that 88% of the vernal pool habitat will be conserved. To be consistent with the plan, only 12% of the remaining habitat can be impacted. . . . This acreage will be subtracted from the projected 12% loss of habitat.

Id. at 6 (emphasis added). Two months later, the agency repeated that analysis in a BiOp approving the Federal Aviation Administration's plan to expand Brown Field, a small airport in Otay Mesa. Pls.' Ex. 4. The project would destroy ten of eleven pools on the site. Id. at 8. FWS measured the pools by their basin area (.06 acres), and added the surface area within the basin that supported both fairy shrimp (2.55 acres). Id. The remaining pool, which supported the San Diego button celery would be preserved on-site with stakes and monitoring, as well as its nearby watershed. Id. at 2. FWS included the identical language, quoted above, to conclude that the impact on the endangered species would be "subtracted from the projected 12% loss of habitat." Id. at 5. This BiOp also contains a historical chart of the accumulated takes of vernal pool species in the months since the City obtained its ITP. Id. It lists both the Cousins and Route 56 projects just discussed, the Route 125 example, as well as two other projects at Robinhood `Ridge and New Century Center. Id. Using the "vernal pool basin area" measurement, FWS found that .867 acres of vernal pools had been lost since the implementation of the .MSCP. Id.
Each of these BiOps is silent about how that calculation will be used to determine when the City's 12% cap will be reached. Thus, these projects confirm the Plaintiffs' assertion that FWS is allowing continued destruction of vernal pool habitat consistent with the City's unilateral selection that a 12% "impact" is permitted.[21]
The Builder Developers join the Federal Defendants' and argue that the 12% measure is not as it appears. The Builder Intervenors stress that the MSCP requires developers to comply with the "no net loss" policy that was borrowed from the CWA ง 404 permit process. This argument misses the point. FWS did not anticipate take of vernal pools within the jurisdictional waters of the United States (that is, as regulated by the ACOE at the time FWS issued the permit to the City), therefore, it did not evaluate the impact of any take of the vernal pool species when it issued its BiOp on the City's ITP. Whether the 12% measure is an unintended consequence or an undetected structural flaw in the City's HCP, it has not been evaluated by the agency entrusted with the conservation of listed species. FWS did not consider a 12% loss of habitat, whether or not that impact would be compensated by the "no net loss" policy of the CWA. Thus, it *1151 does not help that the City's MSCP and Subarea Plans incorporates the "no net loss" policy. The lack of scrutiny by the agency is fatal. ง 1536(a)(1) (duty of Secretary to review programs and use authority to conserve species), ง 1536(a)(2) (duty of Secretary to use best scientific data to insure actions do not jeopardize the continued existence of the species and the integrity of their habitat), ง 1539 (duty of Secretary regarding issuance of ITPs).
Moreover, as mentioned above, this argument fails because the "no net loss" standard is an inadequate substitute to conserve the vernal pool species.[22] The "no net loss" standard requires the developer to "avoid" impacts "where reasonably possible." City of Ridgeland v. National Park Serv., 253 F.Supp.2d 888, 905-06 (S.D.Miss.2002); Coeur D'Alene Lake v. Kiebert, 790 F.Supp. 998, 1009 (D.Idaho 1992) ("no net loss" policy is "simply a statement of goals for the agencies to strive for in the interpretation and administration of the CWA and the administrative guidelines under Section 404"); Robbins v. United States, 40 Fed.Cl. 381, 388 (1998). The reasonableness standard of take is incompatible with the ESA command to conserve the species, "to halt and reverse the trend toward species extinction," and to strike the balance in favor of protecting the listed species. Tennessee Valley, 437 U.S. at 184, 194, 98 S.Ct. 2279. The Builder Intervenors' interpretation would, in effect, substitute, a lenient CWA standard for the strict ESA standard. These statutes are not interchangeable when listed species are concerned. FWS has repeatedly noted that the CWA has not effectively prevented or limited damage to vernal pools. In 1993, FWS stated that "Section 404 of the CWA has not historically provided adequate protection to [Riverside fairy shrimp and three plants] from grading or fill activities for most pools." 58 Fed.Reg. at 41388. FWS identified one problem as ACOE's inability to regulate significant threats to the vernal pools, such as "grazing, off-road activity, and seeding with non-native species." Id. Moreover, ACOE Was not regulating "activities within the watershed (i.e., adjacent upland) of vernal pools;" yet "[t]he watershed is an essential component of the vernal pool eceosystem." Id. at 41389. The vernal pool species have highly specialized requirements for hydrology and soil conditions. For example, "[h]igh livestock densities may result in excessive physical disturbances, such as trampling, and changes in pool water chemistry and water quality" that negatively impact the San Diego fairy shrimp. 62 Fed.Reg. at 4930. The area around the individual pools is so sensitive that even "[t]rampling of pool margins and thinning vegetation from overgrazing may increase pasture runoff, leading to erosion and increased siltation of vernal pool habitat." Id. In February 1997, during the *1152 time that FWS "was reviewing the MSCP, FWS noted that the San Diego fairy shrimp continued to sustain substantial habitat losses under existing CWA's ง 404 permits and "no net loss" policy, state laws such as California's Natural Community Conservation Planning Act, and local regulatory measures. 62 Fed.Reg. at 4935-36 & 4931-42 (in the three years between 1993 and 1996, FWS identified 15 unauthorized projects in San Diego that destroyed or damaged 40 vernal pools); id. at 4932-34 (surveying the current and planned construction and development projects that would further destroy, damage, or fragment the vernal pool habitat in San Diego). That February 1997 listing decision expressed concern that the City's MSCP planned to protect "[o]nly a portion of the extant vernal pools" and that serious threats to the species continuing viability remained. Id. at 4937. In making the decision to list the spreading navarretia in October of 1998, three months after the City obtained its ITP, FWS stated that the involvement of the ACOE "does not ensure their protection." 63 Fed.Reg. at 54987 ("At least two vernal pool complexes that represented suitable habitat for Navarretia fossalis that were under ACOE jurisdiction in San Diego county have been destroyed or degraded without a section 404 permit.").
The inadequacy is vividly illustrated by the four site-specific projects, just discussed, where FWS approved destruction of vernal pool habitat using the CWA standard to measure the mitigation. E.g., Pls. Ex. 4 at 4-5 (FWS notes "the mitigation is not always implemented"), 9 (noting ACOE had not yet required mitigation that had been ordered four years earlier on Montgomery Field and the species had died). The "no net loss" standard allows unavoidable impacts to be compensated by "creating or replacing" the acreage "in order to prevent any net loss of wetlands." Ridgeland, 253 F.Supp.2d at 905-06. As applied to the vernal pool species, the AR shows without dispute that the "creation" of off-site vernal pools is ineffective and unacceptable mitigation. 62 Fed.Reg. at 4931 (relocation of soil is not viable; attempts to collect and move eggs have failed to show long-term viability; and reintroducing species into other pools risks hybridization); AR 24435 (because creation of vernal pool habitat is not successful, "the wildlife agencies do not accept creation as mitigation for vernal pool impacts"); AR 32472 (FWS concludes that efforts to "create" vernal pools by transporting the soil are unsuccessful, unscientific, and unmonitored, and transplanting species had not been tested or proven successful). Efforts to transplant the cysts of fairy shrimp have only been experimental, is extremely risky given the susceptibility to damage by crushing or keeping inadequate temperature controls requirements of the eggs, and have not been monitored for long term success. 62 Fed.Reg. at 4931. And attempts to restore fairy shrimp habitat, may damage or destroy them. Id. Yet, in each of the projects discussed above, FWS found "no jeopardy" because the impact to the vernal pools on those sites would be mitigated as defined by the CWA's "no net loss" standard.[23] The 12% measurement problem is *1153 thereby compounded by the type and extent of mitigation that has been accepted by FWS on particular development sites.
Another significant problem with the use of the percentage measurement is that the base is undefined. The record contains a variety of measurements of vernal pool acreage (for example if the watershed and upland acres are included) and the chosen definition significantly affects the calculation of the remaining habitat. Compare AR 32464 (in 1995 Carlsbad Field Office estimates "898 acres of original vernal pool habitat in San Diego is extant") with AR 23340-41 (in 1996 FWS used figures of 3,254 total acres in region, then excluded 2,071 acres on military land, to find 1,183 acres of vernal pool habitat within City's MSCP); compare AR 32464 (1986 FWS field study estimates 1,796 acres) with AR 31905-06 (Pls.' Ex. 22) (1986 Bauder reports 2,068 watershed acres); see also AR 16648-51 (Builder's Tab 23 calculates percentages including military lands), 32880-94 (Fed. Defs' Ex. P noting difficulty of quantifying historical losses). The record is devoid of any indication of how the City or FWS would determine when this 12% bar had been reached. Is the 12% to be measured from the estimate of vernal pool habitat thought to be in existence in 1995, or will it be adjusted as, recent surveys document that suitable habitat actually remains in the region as direct and indirect impacts (and possibly natural events) continue to degrade vernal pools? FWS is tallying the accrued loss of vernal pools without adjusting for the overall, current status of the species.
Yet another critical flaw of a fixed percentage is that it does not allow for an assessment of the quality of the habitat (for example, is it in pristine or degraded condition; is it isolated or part of a larger, connected complex of pools; what are the edge effects of the particular site that will affect the viability of the pools). Nor does it take into account the critical inquiry of whether the pools at issue are occupied by fairy shrimp. See 62 Fed.Reg. at 4929 (upon review of all data, FWS estimates San Diego fairy shrimp "inhabits a minimum of 25 vernal pool complexes" from Santa Barbara to Baja, and clarifying that "less than 81 ha (200 ac) of habitat remain that support the species") (emphasis added), 4932-34 (inventory of locations that contain suitable habitat). The lack of a qualitative measure frustrates the purposes of the ESA to provide both "a means whereby the ecosystems upon which endangered species and threatened species may be conserved" and "a program for the conservation of such endangered species and threatened species." ง 1531(b). This flaw is amplified for the vernal pool species because it is important to consider whether particular pools are or are likely to become isolated, hybridized, or damaged by edge effects. For that reason, FWS has found that the best measure is by "pool complexes." 62 Fed. Reg. at 4926; accord AR 7969-70 (Ogden biological report sets standard as requiring "within dedicated managed preserve a minimum of 98% of the acreage of extant vernal pool habitat," and concluding that the 2% impact should exclude "large or high value" complexes, which he then identifies). Given the strict, specialized environmental requirements of the vernal pool species (including the. depth of pool, *1154 water temperature, and soil acidity) and its exceptional sensitivity to harm (including watershed issues such as drainage and pollution, edge effects of neighboring land uses, and trampling), the Court concludes that allowing the City to develop in compliance to the 12% measure is flawed because it is a free floating measure that is not anchored to a baseline or governed by any consistent measurement.
What is clear is that when calculating the mitigation that will be required in exchange for the destruction of vernal pool habitat the smallest measure โ the square footage of the surface area of the pool โ is used. In the Cousin's Market Center project in Mira Mesa, for example, FWS allowed the take of all 64 vernal pools on the site.[24] This was one of the two largest areas of vernal pool habitat. See AR 30092, 32882 (Figure 1). FWS measured the required mitigation as .2 acres, that is, 8,500 square feet of vernal pool surface area. This is not a fair trade, and such a parsimonious measure will not "halt and reverse the trend toward species extinction." Tennessee Valley, 437 U.S. at 175, 98 S.Ct. 2279.
Finally, Plaintiffs correctly observe that the 12% measure contradicts the available scientific data relied upon by FWS. The use of internally contradictory reasoning indicates arbitrary action. Defenders of Wildlife, 420 F.3d at 959. Ogden, whose studies were relied upon in the listing decisions, studied the design of a San Diego preserve and suggested that a viable standard might permit a 2% impact on vernal pool species. AR 7969-70 (Pls.' Ex. 17). Even that 2% figure was not a fixed measure, for example, given the precarious position of the Riverside fairy shrimp and four of the vernal pool, plant species, the report stated that 100% of these populations should be preserved. Id. at 8029 (prostrate navarettia), 8033 (California orcutt grass), 8035-37 (San. Diego mesa mint and Otay `Mesa mint), 8047 (Riverside fairy shrimp). In its February 1997 listing decision, during the time that FWS was evaluating the City's application, FWS concluded that "the continued survival and recovery of the San Diego fairy shrimp can only be assured at this time by the preservation and enhancement of extant vernal pools and their associated watersheds." 62 Fed.Reg. " at 4931; accord Pls.' Ex. 2 at 11 (in a 1995 BiOp authorizing destruction of 162 vernal pools in Otay Mesa, FWS concluded that "[i]n the future, it is unlikely that mitigation measures could be developed to offset any additional losses to this habitat type. Avoidance will likely be the only acceptable strategy in planning projects within vernal pool habitat"). The 12% figure is also inconsistent with the FWS's Vernal Pool Recovery Plan.[25] AR XXXXX-XXX (Fed. *1155 Defs.' Ex. M). FWS concluded that the vernal pool species might be reclassified from endangered to threatened status if the existing populations were stabilized and protected. Id. at 32616, passim. In particular, the "Riverside fairy shrimp and their associated watersheds should be secured from further loss and degradation in a configuration that maintains habitat function and species viability." Id. at 32616-17. There must be a "rational connection between the facts found and the choice made," and here, a 12% across-the-board destruction runs counter to the evidence of the species' survival and recovery in light of its vulnerabilities of the remaining vernal pool species in Southern California. Baltimore, 462 U.S. at 105, 103 S.Ct. 2246.
In sum, the agency's BiOps demonstrate that FWS itself is using the 12% figure as a measure of permissible loss. Yet, FWS confirmed that it did not evaluate the impact of future development activities in accordance with the City's HCP documents because it anticipated virtually no take of the vernal pools. FWS's proposed explanation runs counter to the evidence before the agency, as well as being inconsistent with the agency's prior position on the needs of these imperiled, and extremely particular, vernal pool species. Motor Vehicle, 463 U.S. at 43, 103 S.Ct. 2856; Citizens to Preserve, 401 U.S. at 415-16, 91 S.Ct. 814; Defenders of Wildlife, 420 F.3d at 959.
E. Adequate Funding
Plaintiffs argue that FWS's conclusion that the City's HCP identified adequate funding to implement and monitor the program is not supported by the facts. TAC ถ 65, 67; see Center for Biological Diversity v. Norton, 254 F.3d 833, 839 (9th Cir.2001). Section 10 of the ESA requires FWS to find that the applicant "will ensure that funding for the plan will be provided." ง 1539(a)(2)(B)(iii); e.g., National. Wildlife v. Norton, 306 F.Supp.2d at 926-27. The applicant cannot rely on speculative future actions of others. National. Wildlife v. Babbitt," 128 F.Supp.2d at 1294-95; Sierra Club v. Babbitt, 15 F.Supp.2d at 1280-82.
The City will bear two main categories of expenses. First, the money to acquire the land that it must contribute to the Preserve, and second, the funds required to administer the MSCP and Subarea Plan for the life of the ITP. See generally AR 19433-56, 24669, 24677-87, 25040, 25046-47, 25114-17, 26837-43. For the land purchase, the City estimated that it would need to acquire 2,400 acres from willing sellers at fair market costs. AR 19445-51, 19725, 19378-79. The land acquisitions must be completed within thirty years (except that certain parcels slated for imminent development must be acquired immediately). AR 19444, 25116-17, 39654. It is important to acquire open space promptly, so as to insure the Preserve "will be established before essential resources disappear." AR 24147. The purchase of 2,400 acres would be expensive. AR 19446 (using conservative estimate of $9,700 to $13,300 per acre, City's share would cost between $40 and $70 million); AR 26840 (using conservative estimate of $27,000 per acre, the City would need $62 million dollars); see AR 5363-64 (financial projections are "overly optimistic"). With the exception of 1,400 acres, however, the City *1156 will acquire 1,000 acres for the MHPA Preserve through mitigation from developers who impact land outside the Preserve through open-space easements and landuse regulations. AR 39598 (MSCP Table 4-3); AR 24956 (Subarea Plan ง 1.7); AR 26572 (IA ง 11.1). In addition, the City would require continuous funding to manage the Preserve, conduct biological monitoring and maintenance, and to cover administration costs. AR 19447-51.
The Court concludes that FWS arbitrarily concluded that the City ensured adequate funding for the plans will be provided because the City identified undependable and speculative sources for the necessary funds. ง 1539(a)(2)(B)(iii). Although FWS has recited the statutory language in its findings, "merely referencing a requirement is not the same as complying with the requirement." Gerber v. Norton, 294 F.3d 173, 185 (D.C.Cir.2002) (citation, quotations, and alterations omitted). The record does not demonstrate a rational connection between the facts โ the City's shaky pledge to make an effort to find funding โ and FWS's conclusion that the ESA funding requirement had been satisfied.
Plaintiffs emphasize that the City expressly refused to guarantee funding with a clearly identified source of revenue. AR 31070 (City promised to use its "best efforts to implement the financing and land acquisition components"; however, City cannot "guarantee that funds for the purchase of lands in the Preserve System will be available beyond those obtained through the mitigation process."). While an applicant need not acquire all the land nor set aside a trust account of ready cash before obtaining an ITP, the City's reluctance to confirm that it would fund the long-term conservation plan raises a red flag. Cf. Southwest Ctr. for Biological Diversity v. United States Bureau of Reclamation, 143 F.3d 515, 523-24 (9th Cir. 1998); National Wildlife v. Norton, 306 F.Supp.2d at 922-23 (funding plan included detailed, mandatory measures with adjustments allowed for increased costs and a mid-point review).
Rather than create a concrete budget, the City relied on future actions, such as a regional plan with other jurisdictions, a possible bond issue requiring voter approval, or raising the sales tax. AR 19454; AR 25117 (Funding Committee Report); AR 26573 (IA ง 11.2(C)(1)). The uncertainty of these ideas is readily apparent. E.g., AR 12543 (County Supervisor stated "MSCP may need to be scaled back to a level where adequate funding can be assured"); AR 21788 ("the .certainty of the City's funding contributions must be significantly strengthened" in the IA); AR 21805 ("the MSCP merely provides that the participating local jurisdiction applicants will attempt to raise the vast majority of their funding component via future action by the electorate. Of course, local jurisdictions have no control over the electorate."); AR 25031 ("One need only look at recent problems the City has faced on infrastructure financing to see why a carefully delineated plan is necessary," and noting that land prices continue to rise). The Court finds that the applicant has simply relied on speculative future actions by unnamed parties, .namely, the voters, for the majority of money needed to implement the conservation plan. Yet FWS did not express any concern over the City's unlikely funding plan. Sierra Club v. Babbitt, 15 F.Supp.2d at 1281-82. The City's reliance on the participation of the other jurisdictions within the region is extremely unreliable. National Wildlife v. Babbitt, 128 F.Supp.2d at 1295.
If the City's public funding efforts failed, it could not ask the developers to make up the difference. AR 19720 ("No additional fees will be charged to landowners for *1157 biological monitoring."); AR 19725 ("City will not, increase private development contributions"). Consequently, Plaintiffs accurately characterize the language as vague, non-committal, and referring to hopes and promises. E.g., AR 19725-27 (MSCP states City "has been exploring methods" to finance acquisition and maintenance costs, "is seeking short term financing," "agrees to participate in pursuing regional sources of funding," has identified strategies it "intend[s] to pursue," and "will begin a process to procure funding" on a time table); AR 25119 (City "should be encouraged to identify as soon as possible the specific revenue sources" for shortterm financing); AR 26574 (IA ง 11.2(D)) (if regional funding is inadequate, City "will meet and confer to cooperatively develop a strategy to address the funding shortfall."); AR 31070 ("Local jurisdictions shall use their best efforts"). Despite the City's evasion, FWS did not discuss whether the City would be likely to pay for its responsibilities. Cf. Sierra Club v. Marsh, 816 F.2d 1376, 1385 (9th Cir.1987) (in context of mitigation, reliance on promises by others to act in the future is not adequate).
Based upon its review of the record, the Court concludes that FWS could not rationally conclude that the City will ensure adequate funding as the ESA requires. The plan is similar to that in National Wildlife v. Babbitt, 128 F.Supp.2d at 1294-95, where the district court disapproved the ง 10 findings because "of the City's explicit refusal to `ensure' funding" for the mitigation, "the adequacy of funding depends on whether third parties decide to participate," and "no entity will be responsible for making up the funding shortfall."
F. Injunction
Having taken into account that the ALOE will no longer exercise jurisdiction over the isolated vernal pools, thereby eliminating that anticipated avenue of future review on specific sites; and that the Assurances freeze the potential remedial actions to unproven and ineffective measures, as well as the lack of record support for the findings that the City will fund the conservation plan, that "unnatural" vernal pools need less protection, and the ramifications of the 12% measure of loss, the Court grants Plaintiffs' request for an injunction. See Forest Conservation, 50 F.3d at 781 (courts can enjoin future or imminent injury to wildlife).
The Court immediately enjoins Defendants from further executing pending site-specific projects under the ITP affecting the seven vernal pool species. The injunction applies to three categories of activity. First, the Court enjoins any and all pending applications for development of land containing vernal pool habitat. Second, the Court enjoins those projects where the City has granted permission, but the development has not yet physically begun to destroy vernal pool habitat. Third, the Court enjoins further development where the permittee is presently engaged in the destruction of vernal pool habitat.
The Court orders Defendant City of San Diego to serve a copy of this Order forthwith on all applications affected by the injunction.
In view of the definitively irreparable injury that has already been sustained by at least the two animal species, if not all seven vernal pool species involved in this lawsuit, this Court will not stay this injunction.
G. Independent Evaluation of "Biologically Preferred Scenario"
One of the ง 10 prerequisites to an ITP is that the proposed HCP minimize the harm to the species "to the maximum extent practicable." ง 1539(a)(2)(B)(ii). The ESA requires the applicant to disclose the range of actions considered as alternatives to the plan finally proposed and to explain why it rejected those alternatives. *1158 ง 1539(a)(2)(A)(iii). FWS must make an independent determination of practicability and make a finding that the impacts of the taking will be minimized and mitigated "to the maximum extent practicable." ง 1539(a)(2)(B)(ii); Gerber, 294 F.3d at 184. Though the applicant decides the content of its HCP, FWS must determine whether the HCP satisfies the statutory standard. Gerber, 294 F.3d at 184; Jantzen, 760 F.2d at 982 (FWS "must scrutinize the plan"); National Wildlife v. Babbitt, 128 F.Supp.2d at 1292 ("the most reasonable reading of the statutory phrase `maximum extent practicable' nonetheless requires the Service to consider an alternative involving greater mitigation"). If FWS finds that the HCP fails to mitigate and minimize harm to the species "to the maximum extent practicable" โ because the applicant rejected another alternative that would have provided more mitigation or caused less harm to the endangered species and FWS determined in its expert judgment that the rejected alternative was in fact feasible โ then FWS cannot approve the application for an ITP using that less protective proposal.
Plaintiffs argue this case is like Gerber, 294 F.3d at 177-78, where the D.C. Circuit held that FWS erred when it simply relied on the developer's views without making independent findings. "[T]he agency's decisional documents do not contain any analysis whatsoever as to whether implementation of the Reduced Impact Alternative would actually result in additional costs and delay, or whether the magnitude of such costs or delay would render the alternative impracticable." Id. at 185.
Here, the City identified and then rejected four alternatives to its final choice โ the MHPA Preserve that would be assembled and managed as described in the City's HCP. AR 18525, 18640. Plaintiffs focus on the "Biologically Preferred Scenario." Overall, "[t]his alternative would attempt to preserve those lands with the highest conservation value in the [582,243-acre] planning area, including multiple habitats and habitat linkages. This alternative is based heavily on biological criteria rather than other land use issues that determine the feasibility of preservation." 60 Fed.Reg. 12246, 12247 (emphasis added). Plaintiffs contend that FWS did not analyze the practicability of this alternative even though it was more beneficial to the protected species than the chosen MHPA Preserve. Plaintiffs favor the Biologically Preferred Scenario because it (1) had a larger permanent preserve; (2) included property that supported a greater bio-diversity among the protected species, AR 9678, 9688 (Pls.' Ex. 20); (3) contained larger blocks of core habitat areas, AR 9678; (4) provided corridor links to all public lands; and (5) had larger buffers from activities outside the preserve, AR 18648-49; AR 9688 (Table 9); AR 5610-15. Plaintiffs argue FWS violated its statutory duty by ignoring these benefits and failing to evaluate whether the Biologically Preferred Scenario was impracticable. National Wildlife v. Babbitt, 128 F.Supp.2d at 1291-92 ("the record should provide some basis for concluding; not just that the chosen [plan of mitigation and preservation] are practicable, but that [the alternative plan] would be impracticable").
At first glance, it appeared to the Court that the Plaintiffs had identified a serious weakness. In its Record of Decision, FWS simply stated its concurrence with the City's economic analysis, but did not evaluate it. AR 26943; Gerber, 294 F.3d at 185 ("[s]tating that a factor was considered' โ or found โ `is not the same as complying with that requirement'"); see also Sierra Club v. Babbitt, 15 F.Supp.2d at 1281 (issuance of ITP was arbitrary given "lack of any analysis in the Administrative Record" and failure "to provide the necessary analysis" on a statutory factor). FWS stated that the selection of the MHPA Alternative *1159 was "larger" than the other alternatives, and would be "managed." AR 26942-43. Plaintiffs challenged the accuracy of the first statement, and the second factor, ongoing management, was also included in the Biologically Preferred Alternative. Thus, it appeared that FWS had blindly adopted the City's economic rationale as determinative.
After examining the record, however, the Court finds, sufficient evidence in the AR that FWS independently considered and evaluated the more protective alternative. In its Findings, FWS stated that the City rejected the Biologically Preferred Alternative because it was more costly than the proposed plan.[26] AR 26915 (noting City conducted an analysis using population, housing, personal income, and retail sales factors). Cost is a legitimate factor to evaluate alternatives. Bennett, 520 U.S. at 176-77, 117 S.Ct. 1154.
In the Record of Decision, FWS gave another reason for approving the City's decision. FWS eliminated the Biologically Preferred Alternative because "it assumes a smaller preserve system than the one finally negotiated under the MSCP planning process." AR 26943. The Court concludes that FWS properly characterized the MHPA Preserve as being "larger" than the Biologically Preferred Scenario. During oral argument, the Plaintiffs and Federal Defendants disputed the comparative size of the proposed preserves and both parties characterized, the other's alternative as being "smaller." E.g., Pls.' Br. at 31 (citing 224,089 acres of preserve). The record is confusing because the configuration of the proposed preserves changed, over the planning process and because a variety of comparisons were used. E.g. AR 9678 & 18641 (using "planning area" as percentage of the MSCP "study area"); compare AR 18593 (Table 2-1) with AR 18648 (Table 2-6) (listing percentages of vegetation communities within total MSCP area). Ultimately, the AR establishes that the City configured its MHPA Preserve to encompass 171,917 acres of vacant land.[27] AR 39504 (MSCP *1160 ง 3.0); AR 18590 (Aug.1996 Draft EIR). Of that total acreage, protected vegetation and habitat were present on 167,667 acres. The remaining 4,250 acres did not necessarily support a protected species or have an independent biological benefit, but this land contributed to the overall design of the preserve, for example, by providing connecting linkages between sections of the preserve. By contrast, the Biologically Preferred Scenario would create a permanent preserve of 167,000 acres, or 667 acres less than. the MHPA Preserve. Id. at 18641 (Table 2-4) & 18645 (Aug.1996 Draft EIS); but see AR 26940(ROD) (describing "the planning area" as 224,090 acres with 185,738 acres of "habitat," but that only 167,000, acres would be permanently preserved in Biologically Preferred Scenario). The Federal Defendants emphasize that the MHPA Preserve is configured to preserve a larger area of habitat (167,667 acres). Thus, the Court concludes that the Biologically Preferred Alternative cannot accurately be described as being "larger" than the MHPA Preserve. Thus, there is a rational basis in the AR for FWS' assessment that the "Biologically Preferred Alternative was not selected because it assumes a smaller preserve system than the one finally negotiated under the MSCP planning process." AR 26943 (emphasis added).
The Builder Intervenors point out that FWS gave additional reasons for rejecting the Biologically Preferred Alternative in the preliminary Environmental Impact Reports, which distinguishes this case from Gerber. Cf. Gerber, 294 F.3d at 185 (FWS found in both its draft and final EIR that there was a better alternative). FWS found that the Biologically Preferred Alternative would not effectively protect multiple species within a broad range of vegetation communities. Specifically, the percentage of maritime succulent scrub, oak woodlands, and beach habitats was lower when compared to the MHPA Preserve for these vegetation communities. Compare AR 18593 (Table 2-1) with AR 18648 (Table 2-6). In addition, the EIR found that the Biologically Preferred Alternative did not include land that the City deemed important for preservation, such as designated linkages in the urbanizing area. AR 18649 (Aug.1996 Draft EIS) (noting three sections of land excluded). These are valid reasons for rejecting the Biologically Preferred Alternative. Mt. Graham Red Squirrel v. Espy, 986 F.2d 1568, 1571 (9th Cir.1993) ("a court is not to substitute its judgment for that of the agency" if it is informed and rational); Jantzen, 760 F.2d at 986 (same).
The AR shows that each of the proposed preserves included lands that were beneficial to certain vegetative communities. E.g., AR 26940-41 (assessing conservation of coastal sage and gnatcatcher โ the habitat and species that were the impetus for the MSCP process). The relative benefits were complicated by the large number of species involved, and the final plan accommodated the competing interests. E.g., AR XXXXX-XXX (evaluating watersheds in area that supported various habitats and species). These are the types of issues that implicate FWS's expertise. National Ass'n of Home Builders v. Norton, 340 F.3d 835, 843-44 (9th Cir.2003) (deferring to FWS's discretion to evaluate' scientific evidence).
The Court is satisfied that FWS fulfilled its statutory duty in this regard. Baltimore, 462 U.S. at 105, 103 S.Ct. 2246; Motor Vehicle, 463 U.S. at 43, 103 S.Ct. 2856.
H. Framework Management Plan
Plaintiffs contend that the City breached its obligation to prepare a final Framework *1161 Management Plan for the MHPA Preserve, and that FWS should have had that document before approving the ITP. Rumsfeld, 198 F.Supp.2d at 1154.
The Court finds that this argument is based upon a factual error. The Plaintiffs rely on a document with a handwritten notation suggesting that, as of July 15, 1997, the City had not yet prepared its Framework Management Plan. Pls.' Ex. 8 at 26 (IA at 26, ง 10.6(B)) (AR 26568A). The language in FWS's Findings and Recommendations, prepared on July 17, 1997, also suggests that the City's Framework Management Plan had not yet been submitted for review and approval. AR 26912 ("Each take authorization holder will be required under the plan to submit a draft framework management plan to the wildlife agencies within six months of issuance of take authorizations; and to submit a final plan within nine months of issuance of take .authorization.") (emphasis added); accord. AR 26939 (July 1997 Record of Decision) ("A final framework plan is to be submitted . . . within nine months.") (emphasis added). Unfortunately, the language in these documents had not been updated to reflect accurately that the City had prepared its Framework Management Plan; nonetheless, the AR shows that the City completed the required Plan and included it in the final March 1997 version of its Subarea Plan. AR 24900-52 (ง 1.5) (Fed. Defs.' Ex. N). The record also shows that FWS fulfilled its duty to review the Plan in the process of approving the ITP; consequently, this argument fails.
I. Duty to Revoke ITP Upon Violation of Terms
In its Fifth Claim for Relief, Plaintiffs allege that FWS has violated the ESA by failing to revoke the City's ITP. Plaintiffs cite infractions at the Square One Development project as triggering FWS's mandatory duty. Pls.' Ex. 6.
The ESA dictates that "[t]he Secretary shall revoke a permit issued under [ง 10] if he finds that the permittee is not complying with the terms and conditions of the permit." ง 1539(a)(2)(C); Bennett, 520 U.S. at 172-73, 117 S.Ct. 1154 (when ESA mandates an action, the Secretary must use his expert discretion to apply the relevant factors and follow the required procedures).
The City's violation of the permit illustrates the fundamental problem of an umbrella permit that authorizes a municipality that is inexperienced in the technicalities of the ESA to issue ITPs directly to developers. FWS discovered the egregious error only after the vernal pools on the site had been destroyed, and this is fatal and irreparable to the vernal pool species. The harm was exacerbated first, because those vernal pools were occupied by the protected plant and fairy shrimp species, and second, because that site had been set aside as mitigation for an earlier destruction of other vernal pools. Nonetheless, in light of the Court's order to remand for further proceedings on the protections for the vernal pool species and the injunction on further destruction of the species, the Court declines at this time to order FWS to revoke the City's ITP because the finding was tentative. Pls.' Ex. 6 at 3.

Conclusion
Based upon a review of the record, consideration of the arguments of counsel in their briefs and at the hearing, and for the reasons stated above,
1. The Court immediately enjoins the City of San Diego's Incidental Take Permit (No. PRT-830421, dated July 18, 1997, and issued by the United States Fish and Wildlife Service) for those pending and future development projects that "take" any of the seven vernal pool species โ San Diego fairy shrimp (Branchinecta sandiegonensis); *1162 Riverside fairy shrimp (Streptocephalus woottoni ), Otay mesa mint (Pogogyne nudiuscula); California Orcutt grass (Orcuttia californica); San Diego button celery (Eryngium aristulatum var. parishii); San Diego mesa mint (Pogogyne abramsii ); and spreading navarretia (Navarretia fossalis) โ as defined and governed by the Endangered Species Act. 16 U.S.C. งง 1531-44. Specifically, the Court enjoins (1) any and all pending applications for development of land containing vernal pool habitat; (2) those projects where the City has granted permission, but the development has not yet physically begun to destroy vernal pool habitat; and (3) any further development where the permittee is presently engaged in the destruction of vernal pool habitat. The Court orders Defendant City of San Diego to serve a copy of this Order forthwith on all applicants and permittees affected by the injunction as noted above. The Court will not stay this immediate injunction.
2. The Court is unable to approve the Incidental Take Permit as to the seven vernal pool species. The Assurances lock in unacceptable risks to these endangered and threatened species because the planned methods to compensate for development that is certain to occur, is not beneficial to these highly-specialized creatures, yet the measures cannot be modified for fifty years and the Fish and Wildlife Service did not "anticipate" or evaluate the impact of the City's conservation plan on the seven vernal pool species. That problem is critical because the conservation plan covers the remaining habitat for the two fairy shrimp, they are extremely sensitive to their specialized environment, and it is not biologically feasible to move them to another location. The use of a flat 12% measure of impact is arbitrary and capricious, as is the lesser protection afforded "unnatural" vernal pools. The funding is speculative and unlikely. FWS did, however, explain its decision to reject an alternate design for the permanent preserve, and ensured that the City prepared its Framework Management Plan. Because the Court has ordered the Fish and Wildlife Service to review the adequacy of the conservation plan now that the Army Corps' of Engineers will no longer participate in the protection of vernal pools, the Court declines to order the permit revoked. Accordingly, the Court grants in part and denies in part Plaintiffs' Motion for Summary Judgment [# 174]; grants in part and denies in part Federal Defendants' Cross Motion for Summary Judgment [# 189] on the Plaintiffs' Third Amended Complaint; and denies the Builder Intervenors' Motions for Summary Judgment on the Third Amended Complaint [# 197] and their Cross Complaint [# 181].
3. The Court remands the matter to the United States Fish and Wildlife Service with instructions to reinitiate consultation looking toward revisions of the City of San Diego's Incidental Take Permit at least on the seven vernal pool species, and for further action not inconsistent with this decision.
4. The Clerk shall terminate this civil action.
IT IS SO ORDERED.
NOTES
[1] Southwest Center for Biological Diversity, California Native Plant Society, Wetlands Action Network, Save Our Forests and Ranchlands, Cannel Mountain Conservancy, Preserve Wild Santee, Ramonans for Sensible Growth, San Diego Audubon Society, Sierra Club, Horned Lizard Conservation Society, San Diego Herpetological Society, Earth Media, Inc., and Preserve South Bay. These thirteen plaintiffs are represented by the same attorneys. Counsel for plaintiffs withdrew from representation of the fourteenth plaintiff, Iron Mountain Conservancy, but the party itself was not dismissed from the action [Clerk's Doc. No. 90].
[2] The "Federal Defendants" were named in their official capacities, and pursuant to Rule, the names of the current office holders have been substituted in the caption. Fed.R.Civ.P. 25(d). [Doc. No. 241] The Court refers to the defendants by their agency. The Secretary of the Interior delegated responsibility for the ESA to the Fish and Wildlife Service. The three levels of federal officials include the Field Supervisor for the Carlsbad Field Office of the United States Fish and Wildlife Service (originally Ken Berg, now Jim Bartel), as the official directly responsible for the ESA consultations with San Diego; the Regime.) Director of Region One of FWS (Anne Badgley); and the Secretary of the Interior, the department in Washington, D.C. that is responsible for FWS (originally Bruce Babbitt, now Gale Norton).

Similarly, the complaint named the City Manager for San Diego (Michael Uberuaga) as the holder of the ESA permit. The Court refers to this party as the City of San Diego.
The State of California, through its Department of Fish and Game (CDFG), was also a party to the negotiations and agreements. The State is not a party to this litigation.
[3] Plaintiffs voluntarily dismissed the City Manager and its Sixth Cause of Action because the City of San Diego stipulated that its ITP did not authorize take of the seven vernal, pool species. [Doc. No. 134] The Builder Intervenors, however, named the City as a defendant in its Cross Complaint. Cross Compl. ถ 12.

As the holder of the ITP, the City's interests are clearly at stake in this litigation. The City elected not file legal briefs, except to state that it does not contest FWS's conclusion that the ITP did not grant take authority for the vernal pool species. City's Resp. to Mo. for Summ. J. at 3; City's Resp. to Fed. Defs.' Mo. for Summ. J. at 3.
[4] The intervenors include the Building Industry Legal Defense Foundation, the National Association of Home Builders, the California Building Industry Association, the Building Industry Association of San Diego, and Pardee Construction Company. Pardee Construction Company did not join the Cross Complaint, but for simplicity, the Court refers to these parties collectively as the Builder Intervenors.
[5] When Congress's intent is clear, the courts, not the agency, are charged with the basic responsibility for statutory interpretation. A contrary agency, interpretation is entitled to no deference. Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1054-55 (9th Cir.1994) (applying Tennessee Valley, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117, to ง 7 of ESA). "[W]hile reviewing courts should uphold reasonable and defensible constructions of an agency's enabling act, they must not `rubber-stamp . . . administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" Arizona Cattle Growers' Ass'n. v. United States FWS, 273 F.3d 1229, 1236 (9th Cir.2001) (citations, omitted). When Congress had a clear intent, the court must give effect to that intent as law. Wilderness Society v. United States FWS, 353 F.3d 1051, 1059-60 (9th Cir.2003) (en banc).
[6] The parties did not file the voluminous AR because this lawsuit is limited to seven of species discussed in the administrative proceedings. See Notice of Filing Index & Supp. [Doc. Nos. 26 & 43] Instead, the parties submitted relevant excerpts as exhibits to their motions. E.g., Compendium of Cross-Compl.'s AR Cites [Doc. No. 205]; Fed. Defs.' Excerpt from AR. [Doc. No. 254]; Pls.' Record Excerpts [Doc. No. 255].

At the Court's request, the City submitted its annual reports which describe its implementation of the conservation plan and its compliance with the permit. City's Notice of Lodging Supp. to Admin. R. [Doc. No. 254]. Under Ninth Circuit law, however, the Court is not permitted to consider these documents unless they fit within four exceptions. Southwest Ctr. for Biological Diversity v. United States Forest Serv., 100 F.3d 1443, 1450 (9th Cir.1996); Animal Defense Council v. Hodel, 840 F.2d 1432, 1436 (9th Cir.1988). The Court finds that none of the four exceptions applies, and therefore, has not relied on these documents. For the same reason, the Court has not considered several declarations. E.g., Decl. Rikki Alberson; Decl. Leonard Frank. Finally, the Court did not refer to FWS's handbook. Fed. Defs.' Tab O.
[7] The" estimates vary depending on the definition of the area, for example, whether upland acres or watershed acres are included. In 1995, FWS estimated that 898 acres of vernal pool habitat in San Diego county is extant. AR 32464. FWS found the San Diego fairy shrimp occupied vernal pools in less than 200 acres of habitat in this county. 62 Fed.Reg. at 4929; accord id. at 4926. Conversely, the City's conservation plan encompassed 1,183 acres of vernal pool habitat.

The majority, 72%, of the remaining vernal pool habitat in San Diego occurs on lands owned by the military and cannot be designated as a permanent preserve. E.g., 62 Fed. Reg. at 4929-30 ("the protection of the San Diego fairy shrimp at the two bases containing the largest blocks of extant vernal pools within the range of the species is not assured.") (emphasis added); AR 32674 (measuring 3,254 acres including upland and watershed acres, and calculates that 2,071 of those are owned by military).
[8] The MSCP was revised throughout the planning and permitting process. The first draft, dated May 1995, was not filed as an exhibit. The Builder Intervenors provided portions of the second draft, dated April 1996. AR 15079 (Builder Intervenors' Ex. 19); see also AR 20614 (Pls.' Ex. 16) (in September 1996 FWS evaluated differences between May 1995 and April 1996 versions). The AR also contains an August 1996 draft; and portions of Revisions dated December 1996. AR 19296 (Pls.' Ex. 13 & Builder Intervenors' Ex. 25); AR 22437 (Pls.' Ex. 12 & Builder Intervenors' Ex. 31). The earlier versions are relevant because FWS relied upon that August 1996 draft with its revisions to assess whether the City's conservation plan complied with the ESA. AR 26194 & 26197 (listing the record upon which FWS relied to prepare the BiOP and specifying the MSCP documents dated and revised in 1996). The MSCP was not finalized until a year after FWS issued the ITP. See AR 26960-69 (ITP dated July 18, 1997); AR XXXXX-XXX (MSCP dated Aug. 1998) (Fed. Defs.' Ex. J).
[9] This local document, like the regional MSCP, was revised over time, and FWS relied on an early August 1996 draft and its revisions to decide whether to issue the ITP. See AR 26194 & 26197 (BiOp identifies Subarea plan dated August 1996 and revised December 1996). The final Subarea Plan was prepared in March 1997, though it is unclear if FWS relied on that version. AR 24846 (Fed. Defs.' Ex. N).
[10] Builder Intervenors rely on the San Diego National Wildlife Refugee, but the record shows that this separate proposed project is "beyond the scope of the MSCP." AR 24435.
[11] The CWA provides independent protection to waters within the jurisdiction of the United States. United States v. Riverside Bayview Homes, 474 U.S. 121, 133-39, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). The CWA, like the ESA, is structured to prohibit any harmful action unless the responsible agency concludes that certain ecological standards have been met to minimize and mitigate for that harm. 33 U.S.C. งง 1251, 1311, 1344; e.g., 33 C.F.R. Pts. 323, 325.
[12] The wetland species list incorrectly omits two of the vernal pool species. The Federal Defendants and Plaintiffs assert that San Diego button celery and the spreading navarretia were omitted by a clerical error. The Court agrees. The entirety of the record, and in particular, FWS's BiOP, discusses all seven vernal pool species. AR 26235-41. The Court rejects the Builder Intervenors' suggestion that the list is definitive and therefore the MSCP and Subarea plans control these two species without the restrictions in Condition I. Builder Intervenors' Summ. J. Br. at 19 n. 17; Builder Intervenors' Opp. Br. to Fed. Defs.' Mot. to Dismiss at 11 n. 6. Such an interpretation would create an undeserved windfall in violation of the ESA. Because the Court agrees that this was a clerical error, the, Court will, refer to the Condition I list as if it contained all seven of the vernal pool species involved in this lawsuit. On remand, FWS should avail itself of the opportunity to correct the omission.

The term "wetlands" referred to the "jurisdictional wetlands" that were within the regulatory control of the ACOE. The first sentence of Condition I makes it clear that the City's ITP excludes wetland species and expressly places a special restriction on wetland species. The "wetland species", (i.e., species associated with or dependent upon wetlands) includes the seven vernal pool species, thus, these terms are interchangeable. The rest of Condition I further defines the restriction by distinguishing between wetlands/vernal pools either "within" or "outside" ACOE jurisdiction โ as that term was then understood for purposes of the CWA. The second sentence states that wetlands/vernal pools within ACOE jurisdiction, the level of take, if any, would be authorized through future agency consultations between FWS and ACOE. The ง 404 permit process would require the ACOE to independently assess the impact of the development and determine the level of mitigation under the CWA standards. In addition, ACOE would also consult with FWS in compliance with ง 7 of the ESA. The third sentence addresses wetland/vernal pools located outside the jurisdictional reach of the CWA, as that term was understood, and stated that development and mitigation would be governed by the provisions of the MSCP and City's Subarea Plan.
[13] The Record is clear that Federal Defendants believe there may still be instances in which vernal pools are considered to be within the jurisdiction of the ACOE. The Court agrees that each location must be evaluated on its particular facts and analyzed under the applicable statutes, regulations, and case law, including SWANCC; however, concludes that it is highly unlikely that the ACOE would exercise jurisdiction over the isolated vernal pools at issue in this case.

Furthermore, the proposed procedure to go back to the ง 10 permit process with the FWS for further agency approval is contrary to the Assurances in the IA.
[14] The Court found Exhibit C in the Compendium of Cross-Complainant's AR (Ex. 51), but it was not stamped with a specific page number.
[15] FWS did not respond with the alacrity contemplated, by the ESA time schedule for the vernal pool species. For example, FWS noticed the potential peril of the. Otay Mesa Mint and California Orcutt grass as early, as 1975, and the Riverside fairy shrimp, in 1980. 58 Fed.Reg. at 41386. FWS did not determine that these three vernal pool species should, be listed until August 1993 โ a delay of thirteen to eighteen years. Id. Initially, FWS decided that designating the critical habitat was not prudent. 58 Fed.Reg. at 41390; 66 Fed.Reg. 29384 (noting the lawsuit that triggered this action); Bldg Ind. Ass'n of So. Calif v. Babbitt, 979 F.Supp. 893, 905-06 (D.D.C.1997) (in fairy shrimp case, noting presumption that listing decision and critical habitat designation should be concurrent). When FWS undertook the project, it was able to designate the critical habitat for the Riverside fairy shrimp eighteen months later, in May 2001. 66 Fed.Reg. 29384; see also 69 Fed.Reg. at 60113 (noting that designation of critical habitat for spreading navarretia was triggered by lawsuits). FWS completed a recovery plan for the vernal pool species in September 1998, though it aspired only to the modest goal of moving the "endangered" species to the "threatened" species list. AR 32611.
[16] Oddly, FWS in this litigation seeks to distance itself from a document that it prepared in compliance with the ESA and as a result of its expertise. The Federal Defendants argue that its Vernal Pool Recovery Plan is not a binding document and the agency is free to deviate from its findings and conclusions. Fed. Defs.' Cross Mot. Summ. J. Br. at 19. The Ninth Circuit has not yet decided this issue. The Eleventh Circuit held that FWS is not legally obligated to implement a recovery plan because it does not have the force of law. Fund for Animals, Inc. v. Rice, 85 F.3d 535, 547 (11th Cir.1996). The Court respectfully disagrees with the cases minimizing the importance of recovery plans. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Wilderness Society, 353 F.3d at 1059-60; Arizona Cattle, 273 F.3d at 1236; Pacific Rivers, 30 F.3d at 1054-55.

The ESA describes the prototype recovery plan, subject to a reasonableness standard of "the maximum extent practicable,"in ง 1533(0(1)(B). That statutory language specifies that FWS must evaluate the "sitespecific management actions," establish "objective, measurable criteria," and estimate the time and cost to achieve "immediate steps" as well as "measures needed to achieve the plan's goal." Id. These are specific, affirmative actions. FWS is required to make the effort. Congress could not mandate FWS save a species from extinction, thus, the objectives of the recovery plan are aspirations to that degree. FWS has discretion, using its expertise, to decide the content of the recovery plan; however, the ESA clearly requires FWS to follow through with the measures identified in recovery plans.
Indeed, FWS is required to report to Congress every two years "on the status of efforts to develop and implement recovery plans" for all listed species and "on the status of all species for which such plans have been developed." ง 1533(0(3). There would be no need for such ongoing reports if FWS were not endeavoring to meet the goal of recovery, as described in the recovery plan. Moreover, Congress instructed the Secretary to give priority to the development and implementation of recovery plans for species "that are most likely to benefit from such plans," and to species that "are, or may be, in conflict with" development projects. ง 1533(f)(1)(A). The next provision, ง 1533(g), reinforces that Congress expected FWS to engage in earnest and conscientious activity to use the recovery plans to try to remove the species from the protection of the ESA. Section 1533(g) provides that once a species has been removed from the ESA listing, FWS must monitor the species for not less than five years, and orders the Secretary to make prompt use of the ง 7 consultation process "to prevent a significant risk to the well being of any such recovered species."
[17] City employees have no reliable expertise in recognizing situations when these standards apply and the City has no incentive to deny building permits that will generate tax revenues. The ESLO allows the City to grant a variance when the property is "completely covered" by vernal pool habitat "leaving the site without development potential." AR 25754. If the site is under ten acres, the City can accept monetary compensation as mitigation. AR 25748. The City is not a substitute guardian for the protection of endangered and threatened species. AR 22752 (noting four enforcement actions on City-owned property due to "inadvertent disturbance to vernal pools"); see also Pls.' Ex. 6 (after ITP issued, City explained that 8 vernal pools had been cleared in Mira Mesa because "the grading permit was issued in error by employees who did not realize that the entire parcel was to be permanently protected for vernal pool conservation to mitigate impacts from previous development of other property").
[18] For vernal pools on municipal land, the City has a management plan (Builder. Intervenor's Ex. 33), but all mitigation depends upon finding the funds and the recommendations are voluntary (except those parcels where the federal government has stepped in to enforce statutes). E.g., AR 13324, 13330, 22752-54, 22757, 22763. Also, FWS has noted that the City's plans are "seldom enforced" and often overridden. 63 Fed.Reg. at 54988; accord 62 Fed.Reg. at 4936 (1980 plan).
[19] The flaw is also heightened by the failure of FWS to timely prepare its Vernal Pool Recovery Plan. See supra pp. 1134-1136 & nn. 13 & 14. A recovery plan identifies the "site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species." ง 1533(f)(1)(B) (emphasis added). In this case, FWS issued the ITP to the City without the benefit of a Recovery Plan for the vernal pool species. Congress imposed deadlines to avoid conflicts between planned and potential development and the agency's ง 7 consultation process on specific sites โ the very problem occurring in this case. H.R.Rep. No. 97-385, at 20-25. Thus, the administrative process did not incorporate the wisdom of "objective, measurable criteria" that would result in the de-listing of the vernal pool species, nor the time and cost estimates for the intermediate and final achievement of such goals. ง 1533(f)(1)(13)"

Moreover, the goal of this recovery plan is too limited in its objective, in that it seeks to stabilize the existing vernal pool species such that they may be reclassified from the "endangered" list to the "threatened" list โ as compared to eliminating the need for ESA protection. Compare AR 32616, 32684 with ง 1533(f).
[20] Another reason to consider these BiOps is that they show that FWS failed to consider the factor of the 12% loss when it issued its Findings, BiOp, and the ITP. The Federal Defendants have clouded the issue by engaging in circular reasoning: FWS did not anticipate any take so it did not need to evaluate the City's application for a 12% impact, but FWS will not undertake that evaluation in future specific projects because FWS accepts that measure as the touchstone. These BiOps show the actual effect of the ITP and illustrate the omission that Plaintiffs raise.
[21] In three of its BiOps, FWS concluded there would be no impact on critical habitat because no critical habitat designation had been made for these species. Pls.' Ex. 19 at 6 (Cousins); Pls.' Ex. 4 at 10 (Brown Field); Pls.' Ex. 5 at 6 (Route 56). An expedient but unfortunate effect of the backlog and delay in implementing the ESA substantive protections for listed species. See supra n. 13.
[22] Under the "no net loss" guidelines, the ACOE would require sequencing analysis to attempt to achieve a consistent type and extent of mitigation in ง 404 CWA permits. 55 Fed.Reg. 5510 (1990); see generally Moore v. United States, 943 F.Supp. 603, 605-06 (E.D.Va.1996). "[I]t established a sequencing scheme of addressing wetland impacts, requiring first, that the ง 404 permit applicant avoid wetlands impacts, where reasonably possible; that it minimize impacts where unavoidable; and lastly, that it compensate for any loss of wetlands by creating or replacing at least as many acres of wetlands as would be impacted by the development project in order to prevent any net loss of wetlands." Ridgeland, 253 F.Supp.2d at 905-06. The "no net loss" policy provides compensation criteria for unavoidable impacts. It prefers on-site mitigation over off-site mitigation; but if off-site mitigation is not practical, then mitigation should occur within the same watershed. Id. Next, in-kind compensatory mitigation is preferred over out-of-kind mitigation; and finally, wetlands restoration, which has a greater likelihood of success, is preferred over man-made wetlands. Id.
[23] The Cousins development relied upon creation, and required preservation of 23 vernal pools (7,710 square feet) in Mesa Norte and an unspecified number of pools (8,900 square feet) in Gleitch Parcel (which supported a small population of San Diego mesa mint and a large population of San Diego button celery). AR 30089-90 (Pls.' Ex. 26 at 2), 30615. These two off-site parcels provided mitigation for the .2 acres of vernal pool basin lost. AR 30094, 30098. The Route 56 project would preserve and restore .09 acres of vernal pool basin area to mitigate the .04 acre loss, Pls.' Ex. 5 at 7, and the Brown. Field project would preserve and restore .12 acres of existing vernal pool basin area within the planned permanent reserve, to mitigate the .06 acre loss. Pls.' Ex. 4 at 9. Other mitigation included relocation of fairy shrimp. Id. at 2-3 (ถถ 14, 7). Similarly, the Route 125 project contemplated mitigation of .35 acres of habitat, in exchange for "preservation, enhancement, and restoration of existing vernal pool habitat" in Otay Mesa, calculated as .70 acres of vernal pool surface area. Pls.' Ex. 3 at 9-10, 12, 18-19.
[24] Initially, this lawsuit challenged the destruction of the vernal pools on the Cousin's Market Center construction project and sought injunctive relief. Plaintiffs' First Amended Complaint ถ 118-143; see also Second Amended Complaint ถ 57-65 (Cousins and Torrey Surf developments). Plaintiffs immediately sought a temporary restraining order to prevent the destruction of Occupied vernal pools on that site. [Doc. Nos. 5-8]. The district judge presiding over the suit at that time denied the injunction because "the harm has already occurred" as Cousins had collected the species and relocated them to a new site. Order Denying Plaintiffs' Ex Parte Application for Temporary Restraining Order at 4 [Doc. No. 9]. Thus, the Cousins project has been at issue in this lawsuit from the outset, the parties have provided the relevant portions of the Administrative Record on this project, and it is proper for the Court to consider these facts. See Fed. Defs.' Tab E (AR 30088); Notice of Filing Index & Zoutendyk Decl. [Doc. Nos. 25-26].
[25] FWS was preparing this recovery plan at the same time FWS was evaluating the City's ITP and it was based upon the same scientific data of the needs and status of the species. The vernal pool recovery plan states the obvious conclusions from the existing evidence compiled and in the agency's possession at the time it issued the ITP to the City of San Diego. Federal Defendants admit that FWS was preparing the Vernal Pool Recovery Plan during 1997, Answer to TAC ถ 92, thus, the agency would have had the information of its own experts during the time that it evaluated the City's application for an ITP. Federal Defendants also argue that the information in the Vernal Pool Recovery Plan is not "new" information because FWS compiled it from "existing information." Fed. Defs.' Cross Mot. Summ. J. Br. at 19 n. 12.
[26] The parties did not submit the portions of the AR in which the City explained its reasons lop rejecting these alternatives. Cf. Builder Intervenors' Ex. 24 (omits analysis section). The Federal Defendants' cited AR 39656-57 as support for its assertion that the City compared the costs of the alternatives, Cross Mot. Summ. J. Br. at 28; however, this page of the Final MSCP does not discuss the alternative options for designing the preserve.
[27] The City selected the property that would become a part of the preserve on three factors: biological, land use, and economic. AR 18589, The City looked specifically at the vegetation represented in that area (e.g., whether the land supported a "core biological resource," which was defined as an area that supported a high concentration of sensitive or rare species, like the vernal pools), and looked generally to the overall configuration of the preserve (i.e., whether the location of the lands created linkages with other protected land that would benefit the protected species). AR 39478 (MSCP ง 1.2.1 Biological Goal of Preserve); id. at 39483 & 39489; AR XXXXX-XXX (vernal pool species "adequately conserved," meaning "[t]he overall benefits of the multi-species planning effort to the natural ecosystem will provide for the species that inhabit that ecosystem"). The City also considered how the land was currently being used, for example, whether it was already subject to a local regulation (such as an open space easement) that protected the land from development. AR 39480, 39493, 39498. A final factor was economic โ whether the land was already owned by the public, and whether the financial burden of donating land would be equitably distributed among the municipalities and private land owners. AR 39498, 39592-95; accord AR 18589 ("Another goal has been to, maximize the inclusion of public lands within the preserve."); AR 18604 ("The MSCP preserve system incorporates public lands to the greatest extent possible, to minimize the need to acquire private lands and to avoid increasing extractions on private land development beyond the existing requirements of local, state, and federal regulations.").